AARON BLACK et al., Plaintiffs and Respondents, v. SHEARSON, HAMMILL & CO. et al., Defendants and Appellants.

Allen L. Neelley, Malcolm H. Bell, O'Melveny & Myers and Dewey, Ballantine, Bushby, Palmer & Wood for Defendants and Appellants.

Marshall H. Sevin for Plaintiffs and Respondents.

RATTIGAN, J.—The principal elements of this appeal are the duty of a stock broker, owed to his customers who purchase the securities of a corporation, to disclose to them material facts known to him concerning the corporation; the duty of a director of the corporation, owed to it, not to disclose the same facts if he acquired knowledge of them as a director; and the consequences which may arise when the broker and the director are the same person.

Appellant Shearson, Hammill & Co. (hereinafter "Shearson") is a copartnership engaged in the stock brokerage business. At relevant times, appellant Dunbar was a Shearson

partner. He was also a member of the board of directors of United States Automatic Merchandising Company, a corporation ("USAMCO"). Shearson, through Dunbar and others, traded in USAMCO securities. Respondents, customers of Shearson, brought this action against Shearson, Dunbar and others, seeking damages for fraud. The fraud was alleged to have occurred in a transaction wherein respondents purchased certain USAMCO securities through Shearson. The trial court found Shearson and Dunbar liable to respondents for fraud, assessed compensatory and punitive damages against both, and entered judgment accordingly. They appeal from the judgment.

Viewed in the light most favorable to respondents, the record supports the following factual summary: USAMCO was incorporated in July 1960, as a new venture in the automatic vending-machine business. Dunbar who was active in its formation, was USAMCO's principal financial advisor and one of its four directors. His activities in this regard were carried on with the knowledge and consent of Shearson. At his suggestion, USAMCO raised its initial capital by selling $1.00-par common stock and issuing one-year convertible debentures. The debentures were convertible to USAMCO common stock, at the rate of one share for each principal dollar of indebtedness, on October 1, 1961. Dunbar arranged to place some of these debentures with a few of his personal customers, who included Messrs. Gonyea and Rubin. Shearson was paid a fee for Dunbar's services in this transaction. Dunbar also acquired 10,000 shares of the initial issue of USAMCO stock for his own account.

At this time in 1960, Dunbar was Shearson's senior west coast partner in its nationwide operation. As such, he supervised the activities of its thirteen west coast branch offices. He was also in charge of Shearson's over-the-counter trading in the same geographical area. He decided that Shearson would "make the market" in USAMCO stock, which was an over-the-counter item. This meant that Shearson would buy and sell the stock for its own account, taking a profit in markup rather than trading for a commission. Putting this program into effect, Dunbar and Richard J. Teweles, a Shearson partner at its Los Angeles office, actively encouraged their salesmen to sell USAMCO stock to Shearson's customers. One of the many salesmen who undertook an aggressive selling program in the Los Angeles office was Barry Kaye.

The program was successful. During the first several

months of the program, Shearson distributed among its customers—including respondents, who were Kaye's—several press releases and reports concerning USAMCO's operations. USAMCO had been formed to operate according to the so-called "USAMCO Plan," an elaborate selling scheme which need not be detailed here. The circularized documents spoke of the "Plan" in glowing terms. Some of them contained specific statements of fact relating to USAMCO's sales and contracts achieved, expansion, sales and profit projections, and the "acquisition" of several profitable operating companies in a new program undertaken by USAMCO. In general, the documents presented a highly favorable view of USAMCO's situation.

Respondents saw some of these documents and discussed the subject with Teweles and Kaye. The latter reiterated the substance of the documents' contents, made verbal representations of similar nature, and actively solicited respondents to buy USAMCO stock. Respondent Black was told in effect that Dunbar's directorship with USAMCO placed Shearson in a position to receive inside information concerning USAMCO's situation.

The true facts were not at all as presented by Shearson. The "USAMCO Plan" required extensive financing which was not obtainable. In consequence, it was a failure from USAMCO's inception, and the "acquisition" program touted in the Shearson circulars was in fact a complete—and apparently urgent — departure from the "Plan." Where Richard S. Stevens (USAMCO's president) had projected $573,100 in net sales by USAMCO from December 1960, through May 1961, the actual amount of sales during that period was approximately $15,000. As Stevens put it in April 1961, USAMCO's situation at that time was "drastic." None of these facts were reported in the Shearson circulars. Some of the specific statements in the circulars, concerning "new contracts" and such matters, were false.

During this period, Stevens talked to Dunbar almost daily and kept him fully informed of USAMCO's operations. Dunbar attended directors' meetings on an average of twice monthly, and was active in USAMCO's futile efforts to finance the "USAMCO Plan." He was informed by Stevens in April 1961, that the USAMCO situation was "drastic." He also received and read a memorandum, addressed to USAMCO's directors by Stevens in the same month, in which

the author described USAMCO's serious financial plight in unmistakable terms.

Dunbar did not disclose any of these unfavorable facts to Shearson's personnel; throughout this period of time, he spoke favorably of USAMCO's prospects to Teweles and Kaye. However, in March 1961, he stopped soliciting his own customers to buy USAMCO stock. In May, he sold a substantial portion of his own USAMCO holdings at a high profit.

In March 1961, Kaye asked Dunbar if any of his (Dunbar's) customers would be interested in selling their USAMCO convertible debentures at a discount below the current—and high—market price of the common stock. Dunbar talked to Gonyea and Rubin about Kaye's suggestion and recommended that they each agree to sell a $25,000 debenture for $250,000. They assented. Dunbar so informed Teweles and Kaye, knowing that the probable purchasers would include customers of Shearson's. Teweles asked Dunbar what he thought of the transaction, to which Dunbar replied "Nothing has changed the picture."

Kaye solicited each respondent to buy a portion of the debentures, and, to both, he and Teweles highly recommended the purchase. Each respondent consequently agreed to buy, for $20,000, a $2,000 face-value interest in one of the debentures. Dunbar designated Teweles to attend to the transaction. Teweles and Kaye dealt with respondents as buyers, Dunbar with Gonyea and Rubin as sellers. Dunbar instructed Teweles to consult an attorney to handle the legal details. Teweles complied, and corresponded with the attorney on Shearson's letterhead. Kaye arranged financing to enable respondents to make the purchase. The funds were transmitted through Shearson's office.

Respondents each paid $20,000 for a $2,000 interest in one of the debentures. Each converted his interest to USAMCO stock on October 1, 1961, and acquired 2,000 shares of USAMCO stock. The stock having proved worthless, they commenced this action against Shearson, Dunbar, Teweles and Kaye. The trial court granted judgment in favor of Teweles and Kaye pursuant to section 631.8 of the Code of Civil Procedure, but found Shearson and Dunbar liable for fraud. The court awarded each respondent $20,000 in compensatory damages and $5,000 in punitive damages.

Appellants urge that there is no "substantial evidence" that Dunbar knew that any of the statements made to Shearson's customers concerning USAMCO were false.

■ Knowledge of the falsity of such statements, or scienter, is an essential element of fraud. (Civ. Code, § 1572, subds. 1, 2; *id.*, § 1710, subds. 1, 2; *Robinson* v. *Robinson* (1960) 187 Cal.App.2d 677, 681-682 [10 Cal.Rptr. 130]; 2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts, § 198, p. 1383.) ■ "Substantial evidence" is evidence of ponderable legal significance; it must be reasonable in nature, credible, of solid value, and "substantial proof" of the essentials required by law in a given case. (*Krause* v. *Apodaca* (1960) 186 Cal.App. 2d 413, 418 [9 Cal.Rptr. 10].)

■ Appellants' argument is based upon their insistence that Dunbar did not know of the falsity of each successive statement *at the time it was made.* Their premise itself is opposed by the evidence that Dunbar was kept closely and currently informed of USAMCO's operations; it was these operations which were misrepresented to Shearson's customers, including respondents. But, irrespective of whether Dunbar knew that each of the statements was false when made, the evidence is clear that he permitted them to stand after he learned the truth and before respondents relied on them. His knowledge and approval of the statements, accompanied by his knowledge of the truth about USAMCO, were elements in a continuing course of conduct. The evidence concerning it is reasonable, credible and of solid value in establishing scienter on his part: in a word, "substantial."

■ Appellants' second contention is addressed to the evidence that Dunbar — and, through him, Shearson — concealed from respondents material facts concerning USAMCO's true condition. ■ Intentional failure to disclose a material fact is actionable fraud if there is a fiduciary relationship giving rise to a duty to disclose it. (Civ. Code, § 1710, subd. 3. See 2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts, § 197, p. 1381.) A stock broker owes such duty to his customers, whom he ordinarily serves as agent. (*Liberman* v. *McDonnell* (1929) 97 Cal.App. 171, 178 [275 P. 486].) ■ Shearson had acted as respondents' broker and agent in other transactions, and appellants do not dispute the fact that Shearson was respondents' fiduciary. In this regard, the fact that Dunbar concealed facts from Teweles and Kaye (who, rather than he, were dealing with respondents) does not exonerate Dunbar from liability. (*Massei* v. *Lettunich* (1967) 248 Cal.App.2d 68, 73 [56 Cal.Rptr. 232].)

Appellants argue, however, that Dunbar cannot be held liable for nondisclosure to respondents because, as a director of

USAMCO, he had a fiduciary duty not to reveal information concerning the corporation without its authority. The essence of the argument is that, as between Dunbar's conflicting duties, the duty of confidentiality he owed to USAMCO as a director was higher than the duty of disclosure he owed to Shearson's customers as their broker. The trial court considered in this regard, and appellants cite, a circular published by the New York Stock Exchange to its members.*

However, we have been given no sufficient reason for permitting a person to avoid one fiduciary obligation by accepting another which conflicts with it. New York Stock Exchange Educational Circular No. 162 does not support this proposition, and appellants cite no other authority for it. The officer-director's conflict in duties is the classic problem encountered by one who serves two masters. It should not be resolved by weighing the conflicting duties; it should be avoided in advance (a choice contemplated by the New York Stock Exchange: see second paragraph, footnote, *ante*) or terminated when it appears.

The evidence shows that partners in stock brokerage firms commonly serve as directors of newly formed corporations, and that their service is beneficial to the corporations because of the broker's expertise in financing and other corporate matters. Appellants state that this "salutary practice" will end if the broker-director is held to a "traditional fraud stan-

*The reference is to New York Stock Exchange Educational Circular No. 162 (June 22, 1962), which the trial court examined by stipulation. In pertinent part, it reads as follows:

"The Exchange is fully aware of the important public service performed by member firm directors on the Boards of corporations. This is particularly true in the case of a smaller growing company which has only recently done public financing for the first time and whose management may be unfamiliar with problems which may arise in the company's relations with its public shareholders.

"In view of the widespread interest in this topic, it is felt that a general statement of several problem areas which may merit consideration whether or not a directorate is involved, together with a few suggestions, may be helpful to member organizations.

"1. Every director has a fiduciary obligation not to reveal any privileged information to anyone not authorized to receive it. Not until there is full public disclosure of such data, particularly when the information might have a bearing on the market price of the securities, is a director released from the necessity of keeping information of this character to himself. Any director of a corporation who is a partner, officer or employee of a member organization should recognize that his first responsibility in this area is to the corporation on whose Board he serves. Thus, a member firm director must meticulously avoid any disclosure of inside information to his partners, employees of the firm, his customers or his research or trading departments."

Within the meaning of the foregoing language, Dunbar was a "partner" of a "member organization" (Shearson).

dard'' as in the present case. We doubt this, and we do not disparage the value of the broker-director's function; but his brokerage customers should not be deprived of the protection of the "traditional fraud standard" because he was chosen to occupy the dual role.

■ Appellants further contend that Shearson should not be held liable to respondents because the evidence shows that the interests in the debentures were purchased in a "private" transaction in which Shearson was not involved. The point rests upon evidence that the transaction was not entered on Shearson's books and Shearson received no fee for the services of its personnel. Under all the evidence, however, Shearson was properly held liable upon the theory of ostensible agency. (Civ. Code, §§ 2300, 2334; *Walsh* v. *Hooker & Fay* (1963) 212 Cal.App.2d 450, 456 [28 Cal.Rptr. 16]; *Blackburn* v. *Witter* (1962) 201 Cal.App.2d 518, 520-521 [19 Cal.Rptr. 842].)

■ Appellants also challenge the trial court's assessment of punitive damages against each of them. Punitive damages may be awarded, for the breach of an obligation not arising from contract, where "malice" is shown. (Civ. Code, § 3294.) Appellants concede that, despite the contractual aspects of the debenture transaction, the obligation here involved was not one ''arising from contract.''

■ Malice in fact, sufficient to support an award of punitive damages under Civil Code section 3294, may be established by evidence that "the defendant's wrongful conduct was wilful, intentional, and done in reckless disregard of its possible results." (*Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 713 [60 Cal.Rptr. 398].) ■ The trial court found that Dunbar's conduct was "malicious." Under the standard of "malice" as defined above, the evidence supports the finding and the award of punitive damages as against Dunbar. This being so, the award against Shearson was proper. (Corp. Code, § 15013; *Toole* v. *Richardson-Merrell Inc., supra,* at p. 711.)

The judgment is affirmed.

Devine, P. J., and Christian, J., concurred.