[No. B196258. Second Dist., Div. Three. Nov. 25, 2008.]

RONNIE C. BROWN, Individually and as Trustee, etc., Plaintiff and Respondent, v.
WELLS FARGO BANK, N.A., et al., Defendants and Appellants.

942

944

COUNSEL

Kessal, Young & Logan, Neal S. Robb, Evelyn A. Christensen; and Thomas O. Jacob for Defendants and Appellants.

Munger, Tolles & Olson, George M. Garvey and Jeffrey Y. Wu for the Securities Industry and Financial Markets Association, the Chamber of Commerce of the United States of America, the American Bankers Association, the ABA Securities Association, the Clearing House Association and the Financial Services Roundtable as Amici Curiae, upon the request of the Court of Appeal.

Courteau & Associates and Diana L. Courteau for Plaintiff and Respondent.

Reed Smith, James C. Martin, David C. Powell, Raymond A. Cardozo; Kreindler & Kreindler and Gretchen M. Nelson as Amicus Curiae, upon the request of the Court of Appeal.

OPINION

**CROSKEY, J.**—This case comes to us on an appeal from the trial court's order denying a motion to compel arbitration. While this case arises in the context of an attempt to enforce an arbitration clause, the dispositive issue is whether there was fraud in the execution of the entire brokerage account

agreement, of which the arbitration clause was only a part. This case, therefore, is not really about arbitration but rather involves a bank's creation of a fiduciary relationship with one of its customers and the consequences that flow therefrom.

Defendants are various Wells Fargo Bank, N.A., entities; plaintiffs are elderly Wells Fargo customers with substantial assets. In order to ensure that Wells Fargo managed all of plaintiffs' assets, Wells Fargo assigned a "relationship manager" to plaintiffs. The relationship manager was a Wells Fargo vice-president, who made biweekly visits to plaintiffs' home office in order to manage their financial paperwork. She also introduced plaintiffs to an estate attorney, an accountant, and a Wells Fargo financial consultant. In short, the relationship manager induced plaintiffs to rely on her to help provide for their financial well-being.

At the relationship manager's urging, plaintiffs met with the Wells Fargo financial consultant, and opened a brokerage account with him. That brokerage account agreement contains the arbitration clause which led to the trial court's ruling. In executing the agreement, Wells Fargo treated plaintiffs as any other customers opening a brokerage account. In other words, Wells Fargo approached the execution of the brokerage account agreement as though it were part of an arm's-length transaction.

The trial court denied Wells Fargo's motion to compel arbitration on the basis that the arbitration clause was procedurally unconscionable. While we do not disagree with that conclusion, an agreement must also be substantively unconscionable in order for it to be unenforceable for unconscionability. The agreement, which provided for arbitration conducted by the National Association of Securities Dealers, Inc. (NASD), is not, as a matter of law, substantively unconscionable.

Significantly, the trial court also concluded that Wells Fargo had established a fiduciary relationship with plaintiffs, and that this relationship may have given rise to a fiduciary duty on the part of Wells Fargo to make certain that plaintiffs understood the material terms of the contract they were signing. We agree. The trial court, however, failed to consider and rule upon the consequences of this conclusion. That is, whether, under the circumstances, there was fraud in the execution of the brokerage account agreement, which conclusion would necessarily preclude enforcement of any part of that agreement, including the arbitration clause. We will therefore reverse the trial court's order and remand for further proceedings.

## *FACTUAL AND PROCEDURAL BACKGROUND*[1]

1. *The Parties*

Plaintiffs and respondents are the Brown Family Trust and Ronnie C. Brown, individually and as trustee of the Brown Family Trust. Defendants and appellants are Wells Fargo Bank, N.A., and certain related entities.[2] Also included as defendants and appellants are two Wells Fargo employees, Jack Harold Keleshian (Keleshian) and Lisa Jill Tepper (Tepper).

On June 7, 2004, plaintiff Ronnie Brown and her now deceased husband, Ira Brown, executed an "Acknowledgement/Agreement" (the Acknowledgement), by which they entered into a brokerage account agreement (the Agreement) with Wells Fargo Investments as cotrustees for the Brown Family Trust. The Agreement allowed Wells Fargo to make stock trades requested by the Browns.

Plaintiff Ronnie Brown was born in 1922. At the time that she signed the Agreement, she was 81 years old.[3] Ira Brown was a cofounder of Sav-On Drug Store in the 1940's. He had amassed more than 100,000 shares of Sav-On stock, which was valued at more than $1.8 million as of June 2004. At the time he signed the Agreement, he was 93 years old, in failing health and legally blind.

Tepper was a Wells Fargo vice-president and senior trust administrator from October 2001 to August 2006. In June 2004, Tepper was also a licensed stockbroker and a "relationship manager." In deposition testimony, Tepper stated, "[t]he relationship manager oversees the relationship and as needs are uncovered or requests are made by clients, I would introduce another employee of Wells Fargo that could address that particular need." Although Tepper herself did not manage the assets in trust accounts, she received additional compensation when the Browns opened a brokerage account for the Brown Family Trust.

Keleshian was a licensed stockbroker as well as senior vice-president and senior financial consultant for Wells Fargo. Keleshian assisted the Browns with opening the brokerage account for the Brown Family Trust.

---

[1] The parties dispute many of the underlying facts. In particular, they dispute whether certain events occurred prior to June 7, 2004, when the contract at issue was executed. We summarize the facts in a light most favorable to plaintiffs and respondents.

[2] Those entities are Wells Fargo & Company; Wells Fargo Funds Management, LLC; Wells Fargo Capital Management, LLC; and Wells Fargo Investments, LLC. For convenience, we collectively include all of these entities in our use of the term Wells Fargo unless otherwise indicated.

[3] Ronnie Brown stated in her declaration that she was 82 years old at the time of the June 2004 meeting; however she also stated that she was born in October 1922.

2. *Plaintiffs' Relationship With Defendants Prior to the Execution of the Agreement*

The Browns were customers of Wells Fargo Bank prior to the June 7, 2004 meeting (the Meeting) with defendants. They had accounts at Wells Fargo and a branch manager, David Whitesell, assisted Ronnie Brown with paying the Browns' bills.

In late 2003 or early 2004, the Browns met Tepper, who was assigned to assist them as their relationship manager. During the initial meeting, Tepper learned that Ira Brown had limited vision. Tepper testified that when she met Mr. Brown, he was a "little slow."

Beginning in early 2004, Tepper worked in the Browns' home office on a biweekly basis and organized and managed their significant financial paperwork. The Browns provided Tepper with access to all of their financial information.[4] While the Browns believed that Tepper had been assigned simply to assist them with the management of their financial paperwork, Tepper's actual job was "to gather information" about the Browns, and to make certain all of their assets remained under the management of Wells Fargo.

Tepper introduced the Browns to an estate attorney[5] and a certified public accountant. As Tepper started to learn about the Browns' investments, she did not agree with the Browns' investment choices. She then began giving the Browns advice as to their investments. Tepper advised the Browns to change their investment strategy because she did not think their investments were appropriate for people the Browns' age.

Tepper advised the Browns that the easiest method for straightening out their investment portfolio was to open a brokerage account with Wells Fargo. She represented that Keleshian was a stock expert who could handle the Browns' stock portfolio. "At the insistence and repeated urging of . . . Tepper over the months," the Browns ultimately agreed to meet with Keleshian.

During this time period, Tepper also helped the Browns with organizing their documents. As she worked in their home office, she helped them decide which documents to keep and which to shred.

---

[4] During this time period, representatives from Wells Fargo did not inform the Browns that Tepper was a licensed stockbroker. The Browns believed that Tepper was an administrative-type employee of Wells Fargo.

[5] Tepper worked closely with Charles Schulz, the estate attorney she recommended, and attended meetings between Schulz and the Browns. Tepper was present when the Browns discussed "what they wanted in the trust."

### 3. *The Meeting and the Execution of the Agreement*

Prior to the Meeting, the Browns had met with Keleshian on one prior occasion for an introduction. Following that introductory meeting, Tepper then set up the Meeting to open the brokerage account.

On June 7, 2004, Tepper and Keleshian traveled to the Browns' office in El Segundo, California, and met with the Browns for 30 minutes. At that time, the Browns opened three investment accounts: (1) the Brown Family Trust, (2) the Ira D. Brown Trust, and (3) the Ronnie C. Brown Trust. This litigation concerns the Brown Family Trust. Defendants assert, and plaintiffs do not dispute, that the relevant documents establishing the Ira D. Brown Trust and the Ronnie C. Brown Trust contained arbitration provisions identical to the one at issue in this litigation.

At the Meeting, the Browns signed the Acknowledgement and a Trust Certificate of Investment Power. The Acknowledgement, a one-page document, provided that the Browns had read the terms and conditions of the Wells Fargo Investments Brokerage Account Agreement and agreed to be bound by them. The Acknowledgement also stated at paragraph 5 in single-spaced fine print capital letters: "BY SIGNING BELOW I/WE ACKNOWL-EDGE RECEIPT OF A COPY OF THE WELLS FARGO INVESTMENTS BROKERAGE ACCOUNT AGREEMENT WHICH CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE IN SECTION 1, NUMBER 14. MY SIGNATURE ALSO ACKNOWLEDGES THAT I HAVE READ AND UN-DERSTAND THE DISCLOSURES STATED ABOVE."

Page three, section 14 of the corresponding Agreement included the arbitration provision entitled "Pre-Dispute Arbitration Agreement."[6] In single-spaced fine print capital letters, the arbitration provision provided the following introductory statements: "ARBITRATION IS FINAL AND BINDING ON THE PARTIES. [¶] THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL. [¶] PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS. [¶] THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FAC-TUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL, OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED. [¶] THE PANEL OF ARBITRA-TORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY."

---

[6] The Agreement consists of 17 pages. Eleven pages of the Agreement contain two columns of single-spaced small size text. The arbitration provision appears on the third page of text. The text appearing in the record on appeal is difficult to read.

The arbitration provision then provided: "I AGREE THAT ALL CLAIMS, CONTROVERSIES AND OTHER DISPUTES BETWEEN ME AND WELLS FARGO INVESTMENTS AND ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, OR AGENTS ARISING OUT OF OR RELATING TO THE BROKERAGE ACCOUNT OR ANY ORDERS OR TRANSACTIONS THEREIN OR THE CONTINUATION, PERFORMANCE OR BREACH OF THE BROKERAGE ACCOUNT AGREEMENT OR ANY OTHER AGREEMENT BETWEEN YOU AND ME, WHETHER ENTERED INTO BEFORE, ON, OR AFTER THE DATE THIS ACCOUNT IS OPENED, SHALL BE DETERMINED BY ARBITRATION CONDUCTED BY, AND SUBJECT TO THE ARBITRATION RULES THEN IN EFFECT OF, THE NEW YORK STOCK EXCHANGE OR THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. AS I MAY ELECT. IF I MAKE NO WRITTEN ELECTION ADDRESSED TO WELLS FARGO INVESTMENTS BY REGISTERED MAIL . . . THEN I AUTHORIZE WELLS FARGO INVESTMENTS TO ELECT ONE OF THE ABOVE-REFERENCED FORUMS FOR ME. THIS AGREEMENT TO ARBITRATE SHALL BE SPECIFICALLY ENFORCEABLE UNDER PREVAILING LAW AND PROCEDURES. THE AWARD RENDERED BY THE ARBITRATORS SHALL BE FINAL, AND JUDGMENT MAY BE ENTERED UPON IT IN ANY COURT HAVING JURISDICTION OVER THE PARTIES. COUNSEL CAN ADVISE ME ON HOW THIS PROVISION MAY AFFECT ME."

The Browns apparently did not read the preprinted Wells Fargo documents, including the Agreement. They signed the documents almost immediately after they received them from Keleshian. The Browns believed that, by signing the agreements, they were agreeing to open brokerage accounts only. Indeed, Tepper agreed that, as far as she knew, the Browns signed the agreement believing that they were opening accounts.

The Browns were unable to read the fine print in the Agreement. Ira Brown was visibly frail and could not sign his name where indicated.[7] Keleshian knew that Ira Brown was unable to read the documents, and had been told of Ira Brown's limitations during the meeting.

Keleshian, however, did not explain the purpose of the documents to be signed and said nothing about the arbitration provision. Keleshian also did not ask the Browns whether they had any questions and did not offer to read any portions of the Agreement to them.[8]

---

[7] Ira Brown's signature on the Acknowledgement is not on the signature line, but is written below the line at a downward angle.

[8] Keleshian took the position that (1) he was not aware that Ira Brown was legally blind; (2) he told the Browns there was an arbitration clause in the agreement; and (3) he told the

Ronnie Brown was unaware of the existence of the arbitration provision until after this litigation commenced and defendants filed a motion to compel arbitration. Ronnie Brown claims: "Keleshian did not give me a chance to read any of the documents outside of his presence before asking us to sign them, nor did he tell us we could take the documents home and review them before signing them. To the contrary, everything seemed rushed, as if all . . . Keleshian wanted was to 'close the deal.' Wells Fargo seemed intent on ensuring that we signed the brokerage agreement and then turned over the stock certificates to their custody."

Keleshian testified that Tepper was present at the Meeting because the Browns "felt it would be more comfortable for them if [she] was at the meeting." During the Meeting, Tepper took custody of the Browns' Sav-On stock certificates and later placed them in the Wells Fargo vault. Tepper did not think it prudent to inform the Browns to have an attorney present at the Meeting. Nor did she think it was prudent to advise the Browns to have their attorney read the Agreement prior to execution. Tepper did not read any of the Agreement's language to the Browns nor did she point out any particular portions of the Agreement to the Browns. She did not ensure that the Browns had their glasses or determine whether they could read the documents. She did not ask the Browns if they had any questions about the Agreement before they signed it. Counsel for the Browns asked Tepper at deposition: "So what did you do to protect the Browns regarding this purported Agreement?" Tepper responded: "I didn't do anything."

### 4. *Plaintiffs' Allegations*

In May 2006, plaintiffs commenced the present lawsuit. In their operative first amended complaint, plaintiffs assert seven causes of action: breach of contract, fraud, negligent misrepresentation, breach of fiduciary duty, unjust enrichment, negligence and professional negligence.

Plaintiffs allege that in September 2005 Ira Brown was in hospice care and that he was sick and dying. Because she was the primary caregiver, Ronnie Brown was mentally fatigued and physically weary.

At approximately 8:00 p.m. one night, Keleshian allegedly telephoned the Browns at home and represented to the Browns that they must immediately sell 80,000 shares of Sav-On stock or that it would be worthless within days. The Sav-On shares were held in the Brown Family Trust.

Ronnie Brown allegedly stated this should be handled in the morning. Keleshian, however, allegedly pressured her to provide telephonic consent for

---

Browns to read the Agreement later and call him if they had any questions. The trial court was free to accept Ronnie Brown's testimony to the contrary.

the sale, which she did. Ronnie Brown allegedly tried to cancel the sale the following morning. Defendants, however, informed her that the sale had already occurred.

Plaintiffs allege that Wells Fargo sold 74,600 shares of stock at a price of $24.71 per share. They also allege that the during the week following the sale, the stock price rose to $25.40 a share and that the price never decreased to less than $25.30 a share in the next two weeks.

Plaintiffs allege that Wells Fargo breached its duties to plaintiffs with respect to the sale of Sav-On stock. Plaintiffs claim that they had almost no cost basis in the stock, thus causing them to suffer significant capital gains taxes and that Wells Fargo was unjustly enriched by the commission on the stock trade.

Plaintiffs seek compensatory damages in excess of $1 million, as well as attorney fees, punitive damages and trebling of all damages and penalties pursuant to Civil Code section 3345.

5. *Defendants' Motion to Compel Arbitration*

In July 2006, defendants filed a motion to compel arbitration. Defendants asserted that the arbitration provision was a binding and enforceable contract. Defendants further asserted that all of plaintiffs' claims fell within the scope of the arbitration provision.

In their opposition, plaintiffs asserted that the arbitration provision was procedurally and substantively unconscionable. Plaintiffs also argued that based upon their prior relationship with Tepper, Wells Fargo and Tepper were the Browns' fiduciaries and that they owed plaintiffs a duty to protect them when entering into the Agreement with respect to the Brown Family Trust.

Initially, the trial court was of the tentative opinion that the motion to compel arbitration should be granted. The Browns sought further discovery, however, and the trial court continued the hearing on the motion in order to allow the Browns to conduct discovery on the relevant issues. Specifically, the Browns were permitted to conduct discovery regarding the circumstances of the execution of the arbitration agreement, in order to determine whether there was evidence of fraud or unconscionability.

The Browns then filed a further opposition to the motion to compel, in which they emphasized the fiduciary relationship Tepper had established with them. They relied on excerpts from Tepper's deposition, in addition to a declaration from Ronnie Brown. This evidence set forth Tepper's six-month

course of activity in which she purportedly established a relationship with the Browns by which they became dependent on her to handle their financial needs. Plaintiffs claimed that defendants' failure to orally disclose the arbitration provision constituted constructive fraud.

In their supplemental reply in support of the motion to compel, defendants responded that the parties dealt at "arm's length." They also submitted the declaration of John D. Maine, an expert in the securities industry, to the effect that it would be "contrary to accepted industry practice for a stock broker or other investment professional to read a customer agreement aloud to a prospective customer before the customer signs the agreement, attempt to explain it to the customer, and/or advise the customer to consult with an attorney before signing it." As investment professionals "are usually not licensed attorneys," he took the position that "it would be a mistake to suggest that they should attempt to interpret contracts for prospective customers. In doing so they could create more problems—by misinterpreting phrases or leaving out essential terms—than they might be expected to solve."

A hearing was held on January 4, 2007. At the hearing, the court stated its conclusion that there was a fiduciary relationship between the Browns and Wells Fargo. The court stated, however, "I don't think that I'm in a position to make any rulings relative to constructive fraud. I think that is up to a jury panel to decide." The court also did not expressly state whether it found the arbitration provision substantively unconscionable. Instead, the court ruled that "this arbitration agreement under the facts of this case is unfair and it is procedurally unconscionable." Under the "unusual particular facts," the court concluded that Wells Fargo had been required to "do[] more" to assist the Browns in reviewing and understanding the documents they were signing. On that basis, the court denied the motion to compel arbitration. Defendants timely filed a notice of appeal.

## CONTENTIONS

Defendants contend that the trial court erred by denying the motion to compel arbitration. The Browns respond that the motion to compel was properly denied because the arbitration clause was (1) unconscionable; and (2) void for fraud in the execution.

## DISCUSSION

### 1. *Standard of Review*

■ A trial court ruling on a petition to compel arbitration must resolve the factual issues raised by the petition, not simply determine whether factual

disputes exist. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972–973 [64 Cal.Rptr.2d 843, 938 P.2d 903].) There is no right to a jury trial on the issue of whether arbitration agreements should be specifically enforced. (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 412 [58 Cal.Rptr.2d 875, 926 P.2d 1061] (*Rosenthal*).) Thus, the trial court errs if it determines only that factual disputes exist with respect to a plaintiff's argument that an arbitration clause is void for fraud. (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at pp. 972–973; *Rosenthal, supra,* 14 Cal.4th at p. 414.) "[W]hen a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable." (*Rosenthal, supra,* 14 Cal.4th at p. 413.)

The issues of the existence and validity of an arbitration agreement "are to be resolved by the trial court in the manner provided for the hearing and decision of motions [citation], either on the basis of affidavits or declarations or, in the exercise of the court's discretion where necessary to resolve material conflicts in the written evidence, upon live testimony." (*Rosenthal, supra,* 14 Cal.4th at p. 402.)

We review an order denying a motion to compel arbitration pursuant to the substantial evidence standard of review. (*Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653 [35 Cal.Rptr.2d 800] (*Engineers & Architects*).) If there are no disputed facts, the standard of review is de novo. (*Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094, 1099 [118 Cal.Rptr.2d 862] (*Szetela*); *CPI Builders, Inc. v. Impco Technologies, Inc.* (2001) 94 Cal.App.4th 1167, 1171–1172 [114 Cal.Rptr.2d 851].) To the extent there are material facts in dispute, we accept the trial court's resolution of disputed facts when supported by substantial evidence; we presume the court found every fact and drew every permissible inference necessary to support its judgment. (*Engineers & Architects, supra,* 30 Cal.App.4th at p. 653.)

### 2. *State and Federal Policy In Favor of Arbitration*

In deciding whether the parties are required to arbitrate this dispute, we bear in mind the state and federal statutory schemes relating to arbitration and the policies they were designed to further. Through the California Arbitration Act (CAA), Code of Civil Procedure section 1280 et seq., "the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' [Citations.] Consequently, courts will ' "indulge every intendment to give effect to such proceedings." ' " (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899] (*Moncharsh*).)

Likewise, the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., was intended to reverse long-standing judicial hostility to arbitration. (*Shearson/American Express Inc. v. McMahon* (1987) 482 U.S. 220, 225 [96 L.Ed.2d 185, 107 S.Ct. 2332, 2337].) FAA establishes a federal policy favoring arbitration. (482 U.S. at p. 226.)

### 3. *The Court Cannot Treat the Arbitration Provision Differently Than Other Contract Provisions*

■ Section 2 of the FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of *any* contract." (9 U.S.C. § 2, italics added.) "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2. [Citations.] [¶] Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." (*Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687 [134 L.Ed.2d 902, 116 S.Ct. 1652, 1656] (*Doctor's Associates*).) By enacting section 2 of the FAA, "Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.' " (517 U.S. at p. 687.)

In *Doctor's Associates*, the United States Supreme Court struck down a Montana statute which required arbitration provisions to be " 'typed in underlined capital letters on the first page of the contract.' " (*Doctor's Associates, supra*, 517 U.S. at p. 683.) The court held that because the statute treated arbitration contracts differently than other contracts, it was preempted by section 2 of the FAA. (517 U.S. at p. 683.)

"The rule of enforceability established by section 2 of the [FAA] preempts any contrary state law and is binding on state courts as well as federal." (*Rosenthal, supra*, 14 Cal.4th at p. 405.) In most respects, the CAA is similar to the FAA. (14 Cal.4th at p. 406.) In particular, Code of Civil Procedure section 1281, like section 2 of the FAA, provides that arbitration agreements are "valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract."

### 4. *NASD Arbitration*

The arbitration provision of the Agreement states that the parties must submit their claims to arbitration conducted by the NASD or the New York Stock Exchange (NYSE). Defendants moved for an order compelling NASD arbitration.

■ NASD is a "self-regulatory organization (SRO) that licenses and regulates broker-dealers in the national securities industry. Through its wholly

owned subsidiary, . . . it has adopted a Code of Arbitration Procedure (the NASD Code) to govern the arbitration of disputes between its members and their customers." (*Jevne v. Superior Court* (2005) 35 Cal.4th 935, 940 [28 Cal.Rptr.3d 685, 111 P.3d 954] (*Jevne*).) Under the authority of the Securities and Exchange Act of 1934 (SEA), 15 U.S.C. § 78a et seq., the United States Securities and Exchange Commission (SEC) has approved the NASD code (NASD Code).[9] (*Jevne, supra,* 35 Cal.4th at p. 941.)

The primary purposes of the SEA are fair dealing and investor protection in securities transactions. (*Jevne, supra,* 35 Cal.4th at p. 953.) To the extent the NASD Code furthers the primary purposes of the SEA, and was intended to have preemptive effect, state laws which conflict with the NASD Code are preempted by the SEA. (35 Cal.4th at p. 953.)

5. *The Arbitration Provision in the Agreement Was Not Unconscionable*

■ Unconscionability constitutes a generally applicable defense to enforcement of contracts. (Civ. Code, § 1670.5.) Courts have specifically held that unconscionability constitutes a defense against agreements to arbitrate. (See, e.g., *Szetela, supra,* 97 Cal.App.4th at p. 1099.) Plaintiffs, as the party opposing arbitration, had the burden of establishing that the arbitration provision was unconscionable. (*Ibid.*)

Unconscionability has a procedural and a substantive element. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 [99 Cal.Rptr.2d 745, 6 P.3d 669] (*Armendariz*).) " 'The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' " (*Armendariz, supra,* 24 Cal.4th at p. 114; see also *Ontiveros v. DHL Express (USA), Inc.* (2008) 164 Cal.App.4th 494, 501 [79 Cal.Rptr.3d 471].)

In *Parr v. Superior Court* (1983) 139 Cal.App.3d 440 [188 Cal.Rptr. 801], the court reviewed NYSE arbitration rules, which it found to be essentially identical to the NASD Code. (*Id.* at p. 446.) "The NYSE, like the NASD, is an SRO that administers an arbitration program under rules approved by the SEC." (*Jevne, supra,* 35 Cal.4th at p. 944, fn. 3; see also *Parr, supra,* 139

---

[9] At the time of the *Jevne* opinion, the NASD Code was set forth in NASD Rules, rule 10000 et seq. As of April 16, 2007, these rules were superseded by NASD Rules, rule 12000 et seq. for customer disputes and NASD Rules, rule 13000 et seq. for industry disputes. The arbitration in this case would be governed by NASD Rules, rule 12000 et seq., which are materially the same as NASD Rules, rule 10000 et seq. for purposes of substantive unconscionability.

Cal.App.3d at p. 447.) The *Parr* court held: "Without some basis for doing so, we are reluctant to find unconscionable procedures which have been approved by the SEC. We find that the procedures outlined in the NYSE rules display beyond any doubt much more than the requisite minimal integrity." (*Id.* at p. 447; see also *Thomas v. Perry* (1988) 200 Cal.App.3d 510, 515 [246 Cal.Rptr. 156].)

■ We likewise are reluctant to find that the SEC-approved NASD Code is unconscionable. For the reasons stated below, we find that the procedures of the NASD Code are not on their face substantively unconscionable. In light of this finding, we need not address whether the arbitration provision in the Agreement is procedurally unconscionable.

"Substantive unconscionability addresses the fairness of the term in dispute. Substantive unconscionability 'traditionally involves contract terms that are so one-sided as to "shock the conscience," or that impose harsh or oppressive terms.' " (*Szetela, supra*, 97 Cal.App.4th at p. 1100.)

The trial court did not make any express findings regarding substantive unconscionability. However, the court did state that it was concerned with certain aspects of the arbitration provision, namely that the arbitrators' award is not required to include any factual findings or legal reasoning and that the parties' right to appeal is strictly limited.

■ An award issued under the NASD Code must contain, inter alia, a summary of the issues, a statement of the issues resolved, and a statement of the damages or other relief awarded. (NASD Code, rule 12904(e).) An award, however, need not include factual findings or legal reasoning. But this does not, as plaintiffs contend, *favor one side*, and thus does not make the NASD Code substantively unconscionable. It is worth noting that under the CAA, an arbitration award *cannot* be vacated on the grounds that an arbitrator made an error in law or that there was insufficient evidence to support the arbitrator's findings of fact. (Code Civ. Proc., § 1286.2; *Moncharsh, supra*, 3 Cal.4th at p. 11.)

Likewise, the limited ability of the parties to appeal an award does not necessarily make the arbitration provision one-sided. A limitation on appeals is consistent with the California public policy of encouraging expeditious, binding and final resolutions of disputes through arbitration. (See *Moncharsh, supra*, 3 Cal.4th at pp. 8–10.)

Plaintiffs argue that NASD arbitration is substantively unconscionable because under the NASD Code, a minority of arbitrators may be affiliated

with the securities industry. This will result, plaintiffs contend, in a lack of impartiality of some NASD arbitrators and an unfair bias in defendants' favor.[10]

 The NASD Code provides that a majority of the arbitration panel must be comprised of people *not* from the securities industry. (NASD Code, rule 12402.) The parties have a right to strike and rank arbitrators from a list of potential arbitrators produced by NASD. (NASD Code, rules 12403–12405.) Arbitrators are required to disclose conflicts of interest arising from direct or indirect financial or personal interest in the outcome of the arbitration and other circumstances affecting their impartiality. (NASD Code, rule 12408.) The Director of NASD Dispute Resolution may remove an arbitrator for conflict of interest or bias, either upon request of a party or on the director's own initiative. (NASD Code, rule 12410(a).) We do not find these provisions so one-sided as to shock to conscience.

Plaintiffs argue that the arbitration clause is one-sided because they allegedly cannot pursue their Civil Code section 3345 and punitive damages claims in NASD arbitration. Under the NASD Code, however, arbitrators may award "damages and other relief." (NASD Code, rule 12904(e).) Interpreting this same language in the predecessor NASD Code, the United States Supreme Court stated: "While not a clear authorization of punitive damages, this provision appears broad enough at least to contemplate such a remedy." (*Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 61 [131 L.Ed.2d 76, 115 S.Ct. 1212, 1218].)

 Finally, plaintiffs argue that the "discouragement of depositions" in NASD arbitration makes NASD arbitration substantively unconscionable. Under the NASD Code, depositions are generally only allowed to preserve testimony, to accommodate essential witnesses who are unable or unwilling to travel long distances for a hearing, or if other exceptional circumstances exist. (NASD Code, rule 12510.) Such limitations on depositions, however, do not make NASD arbitration substantively unconscionable. Under the CAA, these same restrictions apply to all nonpersonal injury arbitrations, unless the parties agree otherwise. (See Code Civ. Proc., §§ 1283–1283.1.)

 In sum, the arbitration clause the Browns signed was not substantively unconscionable. As such, the finding of procedural unconscionability is irrelevant. Without substantive unconscionability, procedural unconscionability is an insufficient basis on which to deny a motion to compel arbitration.

---

[10] In *Jevne*, our Supreme Court reviewed NASD Code provisions relating to arbitrator impartiality and compared them to the more demanding provisions in the California Judicial Council ethical standards for arbitrators. The court held that the NASD Code provisions relating to arbitrator impartiality furthered the primary purposes of the SEA, and thus the California standards were preempted by the SEA. (*Jevne, supra*, 35 Cal.4th at pp. 958–960.)

### 6. *The Trial Court Must Decide the Browns' Constructive Fraud Defense*

The Browns next argue that the arbitration clause is void for fraud in the execution. Specifically, they argue that Wells Fargo had established a fiduciary relationship with them, such that the failure to draw their attention to the arbitration clause at the time of execution constituted constructive fraud.

 This argument is governed by the California Supreme Court's decision in *Rosenthal*. In that case, the court explained the difference between two different theories of fraud, fraud in the *inducement* and fraud in the *execution*. When a plaintiff alleges fraud in the inducement, the plaintiff is asserting that it understood the contract it was signing, but that its consent to the contract was induced by fraud. In contrast, when a plaintiff alleges fraud in the execution, the plaintiff is asserting that it was deceived as to the very nature of contract execution, and did not know what it was signing. A contract fraudulently induced is voidable; but a contract fraudulently executed is void, because there never was an agreement. (*Rosenthal, supra*, 14 Cal.4th at p. 415.)

When these theories are asserted with respect to an arbitration clause, different procedures apply. This is because arbitration clauses are considered separable from the agreements in which they appear. (*Rosenthal, supra*, 14 Cal.4th at p. 416.) When a party to a contract containing an arbitration clause asserts fraud in the inducement of the contract *generally*, the assertion is no bar to the arbitration of the contract. The separable arbitration clause is considered valid, and the parties must arbitrate whether the contract was induced by fraud (even though a finding of fraud in the inducement may result in rescission of the contract as a whole).[11] (14 Cal.4th at pp. 415–417.) However, "claims of fraud in the execution of the entire agreement are not arbitrable under either state or federal law. If the entire contract is void *ab initio* because of fraud, the parties have not agreed to arbitrate any controversy . . . ." (*Id.* at p. 416.) Thus, claims of fraud in the execution are to be resolved by the trial court, not an arbitrator. (*Ibid.*)

 A necessary element of the defense of fraud in the execution is *reasonable reliance*. That is, when a plaintiff asserts that the defendant misrepresented the nature of the contract, the contract is not considered void due to the fraud if the plaintiff had a reasonable opportunity to discover the true terms of the contract. The contract is only considered void when the

---

[11] If, however, the party is asserting fraud in the inducement of the arbitration clause *specifically*, the assertion is to be resolved by the trial court, as it goes to the validity of the arbitration clause itself. (*Engalla v. Permanente Medical Group, Inc., supra*, 15 Cal.4th at pp. 960, 973; *Rosenthal, supra*, 14 Cal.4th at p. 419.)

plaintiff's failure to discover the true nature of the document executed was without negligence on the plaintiff's part. (*Rosenthal, supra,* 14 Cal.4th at pp. 419–420, 423.)

This issue usually arises when the plaintiff failed to read the terms of the contract, relying instead on the defendant's representation as to the effect of the contract. Generally, it is *not reasonable* to fail to read a contract; this is true even if the plaintiff relied on the defendant's assertion that it was not necessary to read the contract. (*Rosenthal, supra,* 14 Cal.4th at pp. 423–424.) Reasonable diligence requires a party to read a contract before signing it. (*Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1674 [53 Cal.Rptr.2d 515].) This presumes, however, that the parties were dealing *at arm's length*. When the parties are in a fiduciary relationship, the same degree of diligence is not required of the nonfiduciary party. (*Stafford v. Shultz* (1954) 42 Cal.2d 767, 777 [270 P.2d 1].) If the defendant is in a fiduciary relationship with the plaintiff which requires the defendant to explain the terms of a contract between them,[12] the plaintiff's failure to read the contract would be reasonable. (*Lynch v. Cruttenden & Co.* (1993) 18 Cal.App.4th 802, 808–809 [22 Cal.Rptr.2d 636]; see also *Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1291 [73 Cal.Rptr.3d 395]; cf. *Rosenthal, supra,* 14 Cal.4th at p. 425 [finding no such fiduciary obligation].) In such a situation, the defendant fiduciary's failure to perform its duty would constitute constructive fraud (*Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 854 [251 Cal.Rptr. 530]), the plaintiff's failure to read the contract would be justifiable (*Twomey v. Mitchum, Jones & Templeton, Inc.* (1968) 262 Cal.App.2d 690, 715 [69 Cal.Rptr. 222]), and constructive fraud in the execution would be established.

In this case, the trial court found a fiduciary relationship existed between the parties, such that Wells Fargo was required to "do more" to make certain the Browns understood the Agreement. However, the court expressly did not make a finding on whether constructive fraud existed, stating that this was an issue for the jury. This was error; the court was required to resolve the factual issues raised by the petition to compel arbitration, not simply determine whether sufficient evidence existed to go to a jury. We will therefore remand for the trial court to determine whether there was constructive fraud in the execution of the Agreement.

■ Wells Fargo suggests that remand is unnecessary as there is insufficient evidence to establish that it owed plaintiffs a fiduciary duty to explain the terms of the agreement. We disagree. First, there was sufficient evidence to support the trial court's finding of a fiduciary relationship. "Fiduciary" and

---

[12] The scope of a fiduciary's obligations vary according to the facts of the case. (*Duffy v. Cavalier* (1989) 215 Cal.App.3d 1517, 1535 [264 Cal.Rptr. 740].)

"confidential" relationships are relationships existing between parties to a transaction wherein one party is duty bound to act with the utmost good faith for the benefit of the other. Such a relationship ordinarily arises when one party reposes a confidence in the integrity of the other, and the other voluntarily accepts that confidence. (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 270 [130 Cal.Rptr.2d 601].) " '[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law.' " (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 386 [75 Cal.Rptr.3d 333, 181 P.3d 142].) An agent is a fiduciary as a matter of law. (*Twomey v. Mitchum, Jones & Templeton, Inc., supra,* 262 Cal.App.2d at p. 709.) A stockbroker is a fiduciary, as well. (*Duffy v. Cavalier, supra,* 215 Cal.App.3d at p. 1531.) " 'The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party.' " (*Richelle L. v. Roman Catholic Archbishop, supra,* 106 Cal.App.4th at p. 271.) Fiduciary obligations "generally come into play when one party's vulnerability is so substantial as to give rise to equitable concerns underlying the protection afforded by the law governing fiduciaries." (*City of Hope National Medical Center v. Genentech, Inc., supra,* 43 Cal.4th at p. 389.) While it is impossible to identify a single set of factors giving rise to a fiduciary relationship (*id.* at pp. 387–388), some reasons generally used to demonstrate that a party to such a relationship is vulnerable include advanced age, youth, lack of education, ill health, and mental weakness. (*Richelle L. v. Roman Catholic Archbishop, supra,* 106 Cal.App.4th at p. 280.)

Wells Fargo relies on authority providing that a stockbroker's fiduciary relationship does not arise until *after* the brokerage agreement has been executed, and therefore does not require additional disclosures at the time of the execution of that agreement. (*Rosenthal, supra,* 14 Cal.4th at p. 425.) Yet this argument overlooks the unique factual circumstances of this case. Specifically, plaintiffs introduced evidence that (1) for six months prior to the Meeting, Tepper had been the Browns' relationship manager at Wells Fargo; (2) Tepper knew that Ira Brown had limited vision and that his declining health rendered him a "little slow"; (3) Tepper worked biweekly at the Browns' home office; (4) Tepper was provided with access to all of the Browns' financial information, and managed their significant financial paperwork; (5) Tepper introduced the Browns to an estate attorney and an accountant; (6) Tepper gave the Browns investment advice; and (7) Tepper insisted and repeatedly urged the Browns to retain Keleshian to handle their stock portfolio. These facts constitute sufficient evidence to support the trial

court's conclusion that Wells Fargo, through Tepper,[13] knowingly induced the elderly and increasingly frail couple to rely on it to handle their financial affairs, thus creating a fiduciary relationship between Wells Fargo and the Browns.

 We turn now to the issue of constructive fraud, or whether the scope of Wells Fargo's fiduciary duty encompassed oral disclosure of the arbitration clause. A fiduciary generally owes an obligation of the highest good faith. (*Duffy v. Cavalier, supra,* 215 Cal.App.3d at p. 1531.) The scope of a fiduciary's obligations depends on the specific facts of the case. (*Id.* at p. 1535.) Such factors may include, for example, the relative sophistication and experience of the vulnerable party. (*Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 246–247 [70 Cal.Rptr.3d 199].) In this case, plaintiffs introduced evidence that (1) Wells Fargo had, through Tepper, taken on the fiduciary responsibility of handling the Browns' financial needs; (2) for months, Wells Fargo assisted the Browns in paying their bills, and therefore can be inferred to have understood that the Browns required assistance with even rudimentary financial tasks; (3) Wells Fargo knew of Ira Brown's increasing frailty and that his limited vision rendered him unable to read the document Wells Fargo was asking him to sign; (4) Wells Fargo knew that the Browns did not read the Agreement before execution; and (5) Tepper, who had encouraged the Browns to trust her to act in their best interests, was present at the Meeting in order to make the Browns feel "more comfortable." These facts, if accepted by the trial court, would support the conclusion that Wells Fargo's fiduciary duty to the Browns encompassed a duty *not* to treat the execution of the Agreement as an arm's-length transaction and to instead explain the material terms of the Agreement to them.[14]

 The concerns raised by Maine, Wells Fargo's securities industry expert, do not compel a different result. Maine stated that it would be contrary to accepted industry practice for a stockbroker to read an agreement aloud or explain it to a prospective customer; he also asserted that it would be a mistake to require these nonattorneys to interpret contracts for prospective customers. Our conclusion here does not require that stockbrokers generally read or explain their initial agreements to prospective customers; the decision we reach in this matter involves no departure from existing law. We simply conclude that when the facts establish that an investment professional has

[13] When an employee establishes a fiduciary relationship with a third party, the employee's employer is also a fiduciary. (See *Black v. Shearson, Hammill & Co.* (1968) 266 Cal.App.2d 362, 367 [72 Cal.Rptr. 157].)

[14] On remand, should the trial court determine, in resolving the motion to compel arbitration, that the Agreement is void for fraud in the execution, this determination would not foreclose a jury trial on the Browns' causes of action regarding Wells Fargo's allegedly improper sale of the Sav-On stock.

previously *voluntarily induced* a vulnerable individual to repose trust and confidence in the professional, that professional has a fiduciary duty toward that individual, and may be required by that duty to fully disclose, in a manner the individual understands, the material terms of a contract between them.

### DISPOSITION

The order denying defendants' motion to compel arbitration is reversed and the matter remanded for further proceedings consistent with the views expressed in this opinion. The parties shall bear their own costs on appeal.

Klein, P. J., concurred.

**KITCHING, J.,** Concurring.—I agree with the majority that the arbitration provision at issue in this case was not unconscionable for the reasons stated in the majority's opinion. I also agree with the majority that the order denying defendants' motion to compel arbitration should be reversed, and that the matter should be remanded so that the trial court can adjudicate plaintiffs' constructive fraud defense to defendants' motion. I write separately to make clear my views on the scope of the duty of stockbrokers (brokers) to orally explain legal documents to their clients. I would limit this opinion to the unusual facts of this case.

Where no agency relationship has been formed, brokers generally are not required to point out to the customer the existence of an arbitration clause or to explain the consequences of the clause. (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 425–426 [58 Cal.Rptr.2d 875, 926 P.2d 1061] (*Rosenthal*); see *Rush v. Oppenheimer & Co., Inc.* (S.D.N.Y. 1988) 681 F.Supp. 1045, 1052 (*Rush*); *Castro v. Marine Midland Bank, N.A.* (S.D.N.Y. 1988) 695 F.Supp. 1548, 1551 (*Castro*); *Gouger v. Bear, Stearns & Co., Inc.* (E.D.Pa. 1993) 823 F.Supp. 282, 286–288 (*Gouger*).) In *Rosenthal*, there was no "ongoing relationship" between a brokerage firm and its customers. Our Supreme Court stated: "Under these circumstances, we find no authority for the proposition the fiduciary obligations of a broker extend to orally alerting the customer to the existence of an arbitration clause or explaining its meaning and effect." (*Rosenthal*, at p. 425.) In support of this statement, the court cited three federal cases: *Rush, Castro* and *Gouger*. (*Rosenthal*, at pp. 425–426.) In *Rush* and *Castro*, the issue was whether a broker was obligated to disclose or explain an arbitration clause in the *initial* contract between the parties. In both cases, the court held that "brokers are not required as a matter of law to disclose or explain arbitration clauses to the customer." (*Rush*, at p. 1052; see *Castro*, at p. 1551.)

In *Gouger*, a brokerage firm and a married couple entered into an agreement containing an arbitration clause and a choice of law clause approximately one year *after* the firm began providing services to the husband. (*Gouger, supra*, 823 F.Supp. at p. 284.) The court nevertheless held that the failure of the brokerage firm to explain the consequences of the arbitration and choice of law clauses to the clients was not a breach of its fiduciary duty. (*Id.* at p. 288.) Under *Gouger*, even when brokers have developed a fiduciary relationship with their clients, they do not necessarily have a duty to orally explain an arbitration provision.

As a general rule, brokers should not be obligated to orally explain the meaning and effects of an arbitration clause to their clients. "The broker has a high degree of expertise regarding the investment and management of a discretionary account; the broker's knowledge of the law is not as vast." (*Gouger, supra*, 823 F.Supp. at p. 288.) Moreover, requiring brokers to explain arbitration clauses could lead to fact-intensive litigation prior to the commencement of arbitration even when the parties clearly agreed in writing to arbitrate. Disputes could also arise as to whether the broker provided oral disclosure of the arbitration provision and, if so, the adequacy and fairness of the disclosure.[1] Opening the door to such litigation could increase the complexity, cost and uncertainty of the NASD arbitration process. This would not benefit the average investor in his or her disputes with NASD brokers. (See *Jevne v. Superior Court* (2005) 35 Cal.4th 935, 959–960 [28 Cal.Rptr.3d 685, 111 P.3d 954].) Nor would it further the federal and state policies favoring resolving disputes by a relatively inexpensive and expeditious arbitration process. (See *Shearson/American Express Inc. v. McMahon* (1987) 482 U.S. 220, 225–226 [96 L.Ed.2d 185, 107 S.Ct. 2332, 2337]; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899].)

For all of these reasons, we should be cautious before imposing a duty on brokers and their firms to orally disclose arbitration and other material clauses to their clients. When, however, the facts establish that a brokerage firm induced a vulnerable individual to repose trust in the firm regarding a wide range of financial matters, the firm's fiduciary duty may include an obligation to fully disclose, in a manner the individual understands, the material terms of a contract between the firm and the individual. Whether such a duty to disclose arises depends on the particular facts of the case.

---

[1] Under the Federal Arbitration Act, 9 United States Code section 1 et seq., "[e]ven when using doctrines of general applicability, state courts are not permitted to employ those general doctrines in ways that subject arbitration clauses to special scrutiny." (*Iberia Credit Bureau, Inc. v. Cingular Wireless* (5th Cir. 2004) 379 F.3d 159, 167.) Therefore, when we adjudicate a constructive fraud defense to the enforcement of an arbitration provision of a contract, we cannot impose a duty on brokers to orally explain the arbitration provision, unless we also impose the same duty with respect to each and every other material provision of the contract.

In this case, as explained in the majority's opinion, the relationship between defendants and plaintiffs was far more extensive than the typical relationship between a brokerage firm and its clients. Under the unique facts of this case, Wells Fargo Bank, N.A., and its professional employees had a duty to orally disclose to the Browns the material terms of the contract, including the arbitration provision.