Filed 10/23/14  Susoeff v. Michie CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GEORGE J. SUSOEFF et al., | |
| Plaintiffs and Respondents, | G048578 |
| v. | (Super. Ct. No. 30-2012-00545826) |
| DOUGLAS C. MICHIE et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Craig L. Griffin, Judge.  Reversed and remanded with directions.

Douglas C. Michie, in pro. per., for Defendants and Appellants.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Nicole M. Catanzarite-Woodward, for Plaintiffs and Respondents.

Douglas C. Michie, on behalf of himself individually and his dba, the Michie Law Firm (collectively and in the singular Michie), appeals from an order denying his motion to compel arbitration in this dispute with George J. Susoeff and Debra F. Susoeff (hereafter referred to individually by their first names for convenience only). Michie, an attorney, is also a licensed real estate broker and licensed investment advisor who was a registered representative of a licensed securities brokerage firm, which was a member of the Financial Industry Regulatory Authority (FINRA).[1] After he brokered the sale of the Susoeffs' family ranch, Michie advised and assisted them in investing the sales proceeds in tenants in common (TIC) real estate securities sold by the brokerage firm. When those TIC securities investments failed and the Susoeffs lost substantial sums, they sued Michie and the brokerage firm alleging both had improperly induced the Susoeffs to make risky and inappropriate investments. The complaint alleged causes of action against Michie for legal malpractice and breach of an attorney's fiduciary duty, and against Michie and the brokerage firm for breach of a brokers' fiduciary duties, conspiracy, fraud and violation of the Unfair Competition Law.

As part of the TIC securities purchase transaction, the Susoeffs executed an arbitration agreement, signed by Michie as a registered representative of the brokerage firm, providing disputes would be submitted to arbitration before NASD (now FINRA). Although the trial court originally granted Michie's petition to compel arbitration, it subsequently denied the motion concluding the arbitration agreement became unenforceable by Michie when the brokerage firm became defunct and lost its FINRA

---

[1] "FINRA is the self-regulatory organization for securities brokers and brokerage firms and is the successor to the National Association of Securities Dealers, Inc. (NASD). [Citation.] FINRA is responsible for regulatory oversight of all securities brokers and firms that do business with the public; professional training, testing, and licensing of persons registered by FINRA; and arbitration and mediation of disputes. [Citation.]" (*Ronay Family Limited Partnership v. Tweed* (2013) 216 Cal.App.4th 830, 834, fn.1 (*Ronay*).)

2

membership.  We conclude the trial court erred because Michie was entitled to enforce the arbitration agreement.  Additionally, we conclude none of the Susoeffs' other arguments against enforcement of the arbitration agreement have merit.  Accordingly, we reverse the order and remand to the trial court for further proceedings.

FACTS AND PROCEDURE

There are three groups of defendants involved in this litigation (although only Michie is involved in this appeal):  (1) Michie; (2) various entities and individuals associated with the now defunct securities brokerage firm called Welton Street Investments, LLC (Welton Street) including Versus Capital Group, LLC; Versus Capital Advisors LLC; Fountainhead Investors, LLC; Welton Street Group Manager, LLC; Mark Quam; Crystal Marie Daniels; and William Fuhs (hereafter collectively referred to as the Versus Defendants); and (3) a different licensed securities broker dealer called Brookstreet Securities Corporation (Brookstreet), and individuals and entities associated with Brookstreet, including Stanley Brooks, The Brooks Family Trust, and Kathleen A. Covey (hereafter collectively referred to as the Brookstreet Defendants).

The litigation began with a complaint filed in February 2012 naming as defendants Michie, Brookstreet, and Does, alleging causes of action against Michie for legal malpractice and breach of an attorney's fiduciary duty, and against Michie, Brookstreet, and Does for breach of fiduciary duty of a securities broker dealer, conspiracy, fraud, and violation of the Unfair Competition Law.  In short, the complaint alleged Michie represented the Susoeffs in the sale of their approximately 200-acre family ranch outside Sacramento in 2006 for $2.9 million and agreed to assist them in the subsequent investment of the proceeds so as to defer taxes on the proceeds (i.e., a 26 United States Code § 1031 tax-deferred exchange, hereafter a section 1031 exchange), so as to secure their financial future.  The complaint alleged Michie and Brookstreet steered them into risky TIC real estate securities and failed to adequately disclose the risk.  The TIC investments, totaling over $1.4 million, were eventually a total loss to the

3

Susoeffs. The complaint contained allegations that TIC transactions involved "over-leveraged, risky and over-promoted properties with excessive fees and costs." It contained allegations about the Susoeffs' lack of sophistication as investors, that Michie and Brookstreet failed to adequately test the Susoeffs for suitability in investing in TICs, and failed to conduct due diligence in recommending such investments.

The complaint also contained allegations about an attorney-client relationship between Michie and the Susoeffs. It alleged Michie provided the Susoeffs "all manner of general legal work" from 2005 through 2011, relating to the sale of the ranch and investment of the proceeds so as to minimize the tax consequences of the sale of the ranch. It alleged Michie committed legal malpractice and violated various rules of professional conduct for an attorney by failing to: obtain a written legal services retainer agreement with them; discuss the scope of his legal representation of them; disclose he was a registered representative of Brookstreet; disclose conflicts arising from his dual relationship as both a representative of Brookstreet and as their attorney; adequately advise them on the risks of the TIC investments; and secure independent counsel for them. The complaint also alleged Michie continued to commit legal malpractice after the Susoeffs made the TIC investments by failing to properly advise them to get rid of the securities as the investments became insolvent. The Versus Defendants were eventually added as Doe defendants.

The case was originally assigned to Judge Tam Nomoto Schumann. The Versus Defendants filed a petition to compel arbitration and stay the proceedings, in which Michie joined, and Michie filed a separate motion to compel arbitration and stay the proceedings. The motions sought to compel arbitration under both the Federal Arbitration Act, 9 U.S.C. section 1 et seq. (FAA), and the California Arbitration Act, Code Civ. Proc., section 1280 et seq. (CAA) and were largely the same. Both motions asserted the Susoeffs retained Michie, who was the registered representative of Welton Street, to facilitate a section 1031 tax-deferred property exchange. As part of that

4

transaction, the Susoeffs executed an acknowledgment form acknowledging Michie as the registered representative of Welton Street. The three-page acknowledgement form was part of a six-page fax transmission Michie sent to the Susoeffs on November 15, 2005, for review and signature. Also included in that fax was Welton Street's two-page customer account form signed by Michie as Welton Street's registered representative and by Welton Street's principal. Above the signatures on the front page of the customer account form, was the statement: "Acknowledgement of Information Provided & Pre-Dispute Arbitration Clause—The information stated above which I have provided to you is true and correct, further, I acknowledge that I have read the pre-dispute arbitration clause printed in full on the reverse side of this document and accept the clause in its entirety." The reverse side of the customer account form contained only the arbitration clause. It began with the title in large bold capital letters "PRE-DISPUTE ARBITRATION CLAUSE and bold print in all caps contained only the Pre-Dispute Arbitration Clause, Agreement to Arbitrate Controversies" (hereafter the arbitration agreement), which states the signators to the customer account form agree "that all controversies which may arise between us including but not limited to those involving any transaction or the construction, performance, or breach of this or any other agreement between us, whether entered into prior, or on [*sic*] subsequent to the date hereof, shall be determined by arbitration." The Arbitration Agreement provided any such disputes would be submitted to arbitration before the NASD (now FINRA), and resolved pursuant to its rules of procedure.

The motions to compel arbitration both mentioned that although Welton Street was not named in the Susoeffs' original complaint, the Susoeffs had filed a motion seeking leave to file a first amended complaint naming Welton Street as a defendant. Both motions stated Welton Street was now defunct, having been voluntarily dissolved effective August 2010.

5

The Susoeffs opposed the petitions to compel arbitration. As to Michie, they argued the following: he failed to prove the existence of an enforceable arbitration agreement; the arbitration agreement was subject to rescission due to fraud in execution because they did not read or understand what they were signing and Michie, as an attorney and real estate broker had a duty to disclose to them the customer account form contained an arbitration provision; the arbitration agreement was obtained through duress and undue influence by Michie; and if the court found the arbitration agreement was enforceable as to one of the defendants, but not the others, it should not force the Susoeffs to litigate in two forums.

The Susoeffs' opposition was supported by George's declaration. George stated that in 2005, he and his wife were both about 50 years old. Debra had a college degree in physical education, George had only attended two years of college, and neither had any finance, securities, real estate or accounting background, other than what they got from running their family cattle ranch. Michie was a friend of Debra's brother, and she had met him years earlier. The Susoeffs asked Michie to help them with the sale of the family ranch, and Michie said as a lawyer and real estate broker he could handle it for them. Once the escrow opened, Michie began discussing potential tax consequences. Michie warned them that about $2.3 million of the sales proceeds would be taxable, they could end up paying about one-third of that in taxes, but as "an expert lawyer and real estate broker" he could help avoid the tax liability. There was no retainer agreement with Michie, and he was to be paid for his legal work via his real estate commissions. After the escrow closed on September 27, 2005, the Susoeffs understood they had 45 days to identify replacement property for a section 1031 exchange.

George declared that because he and his wife trusted Michie as their friend, lawyer, and real estate broker, they did not read the multiple stacks of forms they received from him pertaining to the TIC investments. With regard to the arbitration agreement, George declared because the forms had been faxed to them, and with each fax

6

transmission the print got smaller and smaller, it was unreadable. Moreover, he declared, Michie affirmatively discouraged them from reading the forms, telling them it was unnecessary because as their lawyer he had reviewed them all. George declared Michie pressured the Susoeffs by telling them they had to hurry and sign the documents because they were right at the 45-day limit for identifying replacement property for the section 1031 exchange.

Michie's reply declaration stated he is an attorney who has a real estate brokerage company in Ventura. George contacted Michie in April 2004 about being his real estate broker for the sale of the approximately 200-acre family ranch. Michie declared he was not the Susoeffs' lawyer and prior to that contact, Michie had never met George and had not seen Debra for decades. After meeting with the Susoeffs, and doing market analysis, Michie and George agreed Michie would act as the Susoeffs' real estate broker for the sale of the ranch. The ranch eventually sold and escrow closed in September 2005.

During the sales process, Michie and George had discussions about how the Susoeffs might invest $2.3 million of the sale proceeds to minimize capital gains taxes, probably through a section 1031 exchange. Michie began looking for properties, but could not find one that suited the Susoeffs' needs. In September 2005, he was contacted by Welton Street, a licensed securities brokerage firm, which offered to sponsor Michie in getting his securities license so he could have access to "Regulation D TIC properties" as potential properties for the section 1031 exchange. When escrow closed, the Susoeffs' investment real estate proceeds were placed with a section 1031 exchange accommodator on September 27, 2005. Michie finished his securities licensing exams, got his license, and became a registered representative for Welton Street in mid-October 2005, after which he began looking at TIC properties for the Susoeffs. He and George travelled the country and looked at several properties. The Susoeffs only had 45 days to identify replacement properties for a section 1031 exchange—November 11, 2005, was last day.

7

While looking for properties, George completed a Welton Street customer suitability form on October 25, 2005, identifying Michie as the registered representative for the broker-dealer Welton Street. Once the investments were identified, on November 15, 2005, Michie faxed the various documents to the Susoeffs for them to read and sign, including the document containing the arbitration agreement and other documents discussing risks associated with a section 1031 exchange, all of which identified Michie as Welton Street's registered representative. On November 16, 2005, George and Debra executed the documents and faxed them back to Michie. At no time did the Susoeffs indicate they had any difficulty reading any of the documents they had received. Michie denied telling the Susoeffs they had to hurry up and sign the documents and denied discouraging them from reading the documents. Additionally, because the copy of the arbitration agreement attached to Michie's moving papers was a "much faxed" copy of the actual document he had received back from the Susoeffs on November 16, Michie attached the actual original document to his reply declaration.

Michie and the Versus Defendants' motions to compel arbitration and stay the proceedings were heard by Judge Schumann on October 2, 2012. The court found that Michie was a signatory to the arbitration agreement as Welton Street's registered representative and the Versus Defendants could enforce the arbitration agreement because they were being sued as agents of Welton Street and were third party beneficiaries of the arbitration agreement. The court specifically rejected each of the Susoeffs' claimed defenses to enforcement of the arbitration agreement. It resolved all evidentiary conflicts in Michie's favor. In particular, the court found George's declaration stating the arbitration agreement he received from Michie was not readable lacked credibility. It found this was particularly so because Michie provided the court with the original of the signed, which was readable. The court found there was no fraud in the inducement or undue influence, and the Susoeffs raised no other defenses to enforcement of the arbitration agreement, such as unconsionability. Accordingly, the

court granted the petitions to compel arbitration and stayed the action as to the moving defendants Michie and the Versus Defendants.  It did not stay the proceeding as to Brookstreet, which had not sought to compel arbitration.  The court granted the Susoeffs leave to file their first amended complaint.

On October 4, 2012, the Susoeffs filed their first amended complaint.  Two new plaintiffs were added—Thomas and Leslie Leech (the Leeches).  The first amended complaint named additional defendants associated with Brookstreet, and named Welton Street and two additional Welton Street associated entities, Fountainhead Investors, LLC, and Welton Street Group Manager as defendants (hereafter referred to collectively and in the singular as Welton Street).  As to Michie, the first amended complaint that was filed contained substantially similar allegations about the risky nature of TIC securities.  It alleged Michie and Covey sold the Susoeffs and the Leeches TIC securities through the Versus Defendants and the Brookstreet Defendants.  It contained allegations that Michie was acting as the Susoeffs' attorney in brokering the sale of the ranch, advising them on tax consequences of the sale, and assisting them with the section 1031 exchange.  It contained the same allegations pertaining to Michie breaching his duties to them as an attorney in the TIC investment process.  It contained allegations that after they made the TIC securities purchases, Michie continued to commit legal malpractice by failing to advise them to get out of the investments as they declined in value, and to disclose his prior malpractice.

In January 2013, the case was reassigned to Judge Craig Griffin.  Newly named defendant Welton Street filed a motion to compel arbitration and stay the action as to the Susoeffs largely mirroring the original motions filed by the Versus Defendants and Michie.  The Susoeffs opposed Welton Street's motion, and filed a separate motion to lift the arbitration stay imposed by Judge Schuman in favor of the Versus Defendants and Michie, arguing that because Welton Street was no longer a member of FINRA, the

9

arbitration agreement was not enforceable by Welton Street or its registered representatives.

The court denied Welton Street's motion to compel arbitration, ruling that because it was no longer a member of FINRA it could not enforce the arbitration agreement. The court stated it was contemplating reconsidering on its own motion the prior trial judge's order granting the Versus Defendants' and Michie's motions to compel arbitration and stay the proceedings, and it set an order to show cause hearing.

At the hearing, the trial court vacated the prior order granting the motions to compel arbitration and stay the proceedings, lifted the stay, and denied the motions. The minute order referred to FINRA Rule 12202, which provides that if a FINRA member is defunct or its membership is terminated, suspended, cancelled or revoked, claims against the member are not subject to arbitration unless the customer agrees to arbitration after the claim has arisen. The minute order stated only that Welton Street was no longer a FINRA member and "there is no dispute that [the Versus Defendants and Michie] are also not FINRA members." At the hearing, the trial court clarified its ruling was based only on the effect of Welton Street's lack of current FINRA membership on enforceability of the arbitration agreement by Michie and the Versus Defendants, and it was not disturbing any of the court's prior rulings regarding the Susoeffs' claimed defenses to enforcement of the arbitration agreement such as fraud, duress, undue influence, or unconscionability. Michie appeals from the order denying his motion to compel arbitration.[2]

---

[2] The trial court's original order granting Michie's motion to compel arbitration was not an appealable order (*State Farm Fire & Casualty v. Hardin* (1989) 211 Cal.App.3d 501, 506), but can be reviewed on a petition from writ of mandate. (*Elijahjuan v. Superior Court* (2012) 210 Cal.App.4th 15, 19-20 (*Elijahjuan*)). The subsequent order denying the arbitration request is appealable (Code Civ. Proc., § 1294, subd. (a)).

DISCUSSION

Michie contends the trial court erred by finding the arbitration agreement was not enforceable by him due to Welton Street's loss of FINRA membership. We agree.

*A. Standard of Review*

Neither party discusses on appeal whether the arbitration agreement is governed by the FAA or the CAA. Michie moved to compel arbitration under both. In their opposition, the Susoeffs argued that because the parties to the Welton Street customer account form did not expressly agree to be bound by the more restrictive provisions of the FAA, the CAA controlled. In their respondents' brief, the Susoeffs refer only to the CAA.

The Welton Street customer account form containing the arbitration agreement is a securities brokerage agreement. The FAA governs arbitration provisions in contracts that involve interstate commerce. (9 U.S.C. § 1.) Security brokerage agreements are governed by the FAA (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 402-403, 405; see also *Mastick v. TD Ameritrade, Inc.* (2012) 209 Cal.App.4th 1258, 1263; *Valentine Capital Asset Management, Inc. v. Agahi* (2009) 174 Cal.App.4th 606, 613 (*Valentine Capital*)), and this is not a case in which the parties agreed California law "governs" the contract (in which the CAA and not the FAA applies). (*Volt Info. Sciences v. Bd. Of Trustees* (1989) 489 U.S. 468, 470; see generally *Valencia v. Smyth* (2010) 185 Cal.App.4th 153.) Although "the [FAA] [citation] applies, state law governs such matters as who is bound by and who may enforce an arbitration agreement. [Citations.]" (*Thomas v. Westlake* (2012) 204 Cal.App.4th 605, 614, fn. 7.)

Under both the FAA and the CAA there is a strong public policy in favor of arbitration. (*Brown v. Wells Fargo Bank, N.A.* (2008) 168 Cal.App.4th 938, 953-954 (*Brown*).) Doubts regarding the validity of an arbitration agreement generally are resolved in favor of arbitration. (*Valentine Capital, supra,* 174 Cal.App.4th at p. 613;

11

*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 686.)

"In reviewing an order denying a motion to compel arbitration, we review the trial court's factual determinations under the substantial evidence standard, and we review issues of law de novo. [Citation.]" (*Duick v. Toyota Motor Sales, U.S.A., Inc.* (2011) 198 Cal.App.4th 1316, 1320.)

B. *Michie May Enforce the Arbitration Agreement*

Michie sought to compel arbitration pursuant to the arbitration clause in the customer account form the Susoeffs signed when they opened an investment account with Welton Street. The customer account form was signed by Michie, Welton Street's registered representative, and by Welton Street's principal. The arbitration clause provided the signators agreed "that all controversies which may arise between us including but not limited to those involving any transaction or the construction, performance, or breach of this or any other agreement between us, whether entered into prior, or on [*sic*] subsequent to the date hereof, shall be determined by arbitration" before FINRA, and resolved pursuant to its rules of procedure.

FINRA Rule 12200[3] provides disputes with customers must be arbitrated if: "Arbitration under the [FINRA] Code is either: [¶] (1) Required by a written agreement, or [¶] (2) Requested by the customer; [¶] The dispute is between a customer and a member or associated person of a member; and [¶] The dispute arises in connection with the business activities of the member or the associated person . . . ." However, FINRA Rule 12202, provides: "A claim by or against a member in one of the following categories is ineligible for arbitration under the [FINRA] Code unless the customer

---

[3] Many of the relevant FINRA regulations and rules were attached as exhibits to the moving and opposing papers below. Additionally, both parties have filed unopposed requests on appeal for judicial notice of FINRA's regulations and rules, and of documents obtained from the FINRA website relating to Michie's current FINRA registration. We grant those requests.

12

agrees in writing to arbitrate after the claim arises:  [¶]  [(1)] A Member whose membership is terminated, suspended, cancelled or revoked; [¶] [(2)] A member that has been expelled from FINRA; or [¶] [(3)] A member that is otherwise defunct."

In this case, Welton Street was a FINRA member when the customer account form containing the arbitration agreement was executed; Michie was not a FINRA member but registered with FINRA as Welton Street's registered representative. But Welton Street had become defunct before the litigation commenced and is no longer a FINRA member.  Accordingly, the trial court applying FINRA Rule 12202 denied Michie's motion to compel arbitration because Welton Street was no longer a FINRA member, and Michie was not a FINRA member in his own right.

After the trial court ruled, the Fourth District, Division One, in *Ronay Family Limited Partnership v. Tweed* (2013) 216 Cal.App.4th 830 (*Ronay*), on virtually identical facts, held a security brokerage firm's loss of its FINRA membership status does not deprive its registered representative of the ability to compel arbitration. Because *Ronay's* exhaustive and well-reasoned analysis of the issue guides us here, we discuss it at length.

In *Ronay*, defendant, Tweed, and his investment firm were registered with FINRA as an "associated person" of a FINRA member securities brokerage firm, CapWest, with whom Tweed opened an investment account for plaintiff, Ronay.[4]  The

---

4        FINRA Rule 12100 defines "'member'" as "'any broker or dealer admitted to membership in FINRA, whether or not the membership has been terminated or cancelled; and any broker or dealer admitted to membership in a self-regulatory organization that, with FINRA consent, has required its members to arbitrate pursuant to the Code and/or to be treated as members of FINRA for purposes of the Code, whether or not the membership has been terminated or cancelled[,]'" and "'associated person'" as (1) '[a] natural person who is registered or has applied for registration under the Rules of FINRA' or (2) '[a] sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any

13

account agreement, signed by Tweed as CapWest's registered representative, contained an arbitration clause stating in part, "'I (we) agree that . . . any controversy arising out of or related to my (our) accounts, the transactions with [CapWest], its officers, directors, agents, registered representatives and/or employees for me (us), or related to this agreement or breach thereof, shall be settled by arbitration in accordance with'" NASD (now FINRA) rules and procedures. (*Ronay, supra,* 216 Cal.App.4th at pp. 834-835, 837.) Tweed then advised Ronay to invest over $4 million in TIC investments that ultimately failed. Ronay sued Tweed and CapWest, among others, claiming they misled Ronay about the risks of TIC investments and caused Ronay to make unacceptably risky investments. The trial court denied Tweed's motion to compel arbitration concluding that because brokerage firm CapWest was defunct and FINRA had cancelled its membership, under FINRA Rule 12202 it was ineligible for arbitration. The trial court concluded that if CapWest could not compel arbitration, its registered representative could not compel arbitration as an associated person. (*Ronay, supra,* 216 Cal.App.4th at p. 836.) The appellate court reversed, holding Tweed could compel arbitration of the dispute. (*Id.* at p. 846.)

On appeal, Tweed contended he could enforce the arbitration clause as a party because he signed the account agreement in his individual capacity, and if a nonparty, he could enforce it as a third party beneficiary and/or because he was acting as CapWest's agent. (*Ronay, supra,* 216 Cal.App.4th at pp. 836-837.) The appellate court rejected the first contention, holding Tweed was not a party to the account agreement—he signed on CapWest's behalf as its registered representative and thus "as the agent of CapWest . . . not [as] party to the agreement with rights and obligations thereunder. [Citations.]" (*Ronay, supra,* 216 Cal.App.4th at pp. 837-838.) The court

such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA.'" (*Ronay, supra,* 216 Cal.App.4th at p. 834, fns. 2 & 3.)

14

went on to explain, however, that Tweed could enforce the arbitration agreement as CapWest's agent and as a third party beneficiary of the arbitration agreement under the rule that "allows a nonparty to enforce an arbitration agreement provided the nonparty has '"a sufficient 'identity of interest'"'" with a party to the agreement. [Citations.]" The court explained Tweed made a prima facie showing he was acting as CapWest's agent in signing the account agreement containing the arbitration clause. (*Id.* at p. 838.) Additionally, Tweed had demonstrated the arbitration agreement was made for his benefit because it required arbitration of "'any controversy arising out of or related to [Ronay's] accounts, the transactions with [CapWest], its officers, directors, agents, registered representatives and/or employees for me (us).'" (*Id.* at p. 839, italics omitted.)

*Ronay* went on to address the issue presented here—whether by application of FINRA Rule 12202, CapWest's loss of FINRA membership prevented Tweed from enforcing any derivative rights under the arbitration agreement. It did not. Although generally "a third party whose rights under a contract derive from those of a party to the contract cannot assert rights greater than those of the contracting party[,]" (*id.* at p. 840), those "general rules governing the rights of agents and third party beneficiaries under contracts between other parties 'should not be applied so inflexibly as to defeat the intention of the parties.' [Citation.]" (*Ibid.*) "[T]he 'key to determining which defenses may be available against the [agent or third party] beneficiary is the relationship among the parties as initially defined in the contract itself.' [Citation.]" (*Id.* at p. 841.) The rights and duties of the parties in *Ronay* "were initially defined by the arbitration clause of the account agreement between Ronay and CapWest[,]" which Tweed could enforce as an agent and third party beneficiary. Because the arbitration clause did not specify what would happen to Tweed's rights to enforce the arbitration clause if CapWest lost its right to do so (*id.* at p. 841), but the parties agreed to abide by the FINRA Rules governing arbitrability, the court turned to the FINRA Rules to determine Tweed's rights.

15

The *Ronay* court first looked at the plain meaning of FINRA Rule 12202. "The plain language of FINRA Rule 12202 makes 'ineligible for arbitration' claims 'by or against *a member'* whose FINRA membership has lapsed . . . ; it says nothing about the arbitrability of a customer's claims against associated persons or others. Hence, the deprivation of the right to compel arbitration upon termination of a member's FINRA membership under FINRA Rule 12202 extends only to the member. [Citations.]" (*Ronay, supra,* 216 Cal.App.4th at p. 842.) The plain meaning was consistent with and supported by NASD's (i.e., FINRA's predecessor's] "interpretation of its substantively identical predecessor rule[,]" which NASD formally notified members "'applie[d] *only to claims against member firms* that fall into one of the categories enumerated in the rule. . . . [¶] [And b]ecause *the rule does not apply to claims against associated persons*, such claims remain eligible for arbitration pursuant to [NASD] Rule 10301(a).' (*Ronay, supra,* 216 Cal.App.4th at p. 842, quoting NASD Notice to Members 01–29 (May 2001) p. 279 [2001 NASD Lexis 33, at p. *6].)

Moreover, *Ronay* observed that unlike FINRA Rule 12202, which mentions only claims against members, other arbitration-related FINRA Rules also referenced associated persons, such as FINRA Rule 12200 requiring "arbitration of disputes 'between a customer and *a member or associated person*,' if the 'dispute arises in connection with the business activities of *the member or the associated person*' and arbitration is required by a written agreement or requested by the customer." (*Ronay, supra,* 216 Cal.App.4th at p. 843.) "Hence, by requiring arbitration of a customer's dispute with either a member or an associated person in FINRA Rule 12200, FINRA demonstrated that it knows how to write rules that apply to both members and associated persons. Had FINRA wanted to deprive both members and associated persons of the right to compel arbitration when a member loses its membership in FINRA, it easily could have done so by expressly including both members and associated persons in FINRA Rule 12202, as it did in FINRA Rule 12200. FINRA's decision to include

16

members but not associated persons in FINRA Rule 12202 thus supports our conclusion that application of that rule is limited to members. [Citations.]" (*Ronay, supra,* 216 Cal.App.4th at p. 843.)

The *Ronay* court rejected Ronay's argument the public policy of protecting investors and promoting the public interest favored extending application of FINRA Rule 12202 to associated persons. That policy was driven by the concern that a defunct member would be more likely to default on paying any arbitration award, and thus aggrieved customers should be spared the expense of first resorting to a likely "fruitless" arbitration process before seeking a judgment. But Ronay had not demonstrated any similar concern as to a FINRA registered associated person, such as the defunct members' registered representative, and because Ronay had already obtained a default judgment against the defunct FINRA member the policy was not implicated. (*Ronay, supra,* 216 Cal.App.4th at p. 844.)

Applying the reasoning of *Ronay*, *supra,* 216 Cal.App.4th 830, we conclude the trial court erred by finding Welton Street's loss of FINRA membership precluded Michie from enforcing the arbitration agreement. As in *Ronay*, even if Michie was not a party to the arbitration agreement, he was entitled to enforce it as an agent of Welton Street.[5] And for the reasons set forth in *Ronay*, FINRA Rule 12202, which deprives former FINRA members of the ability to compel arbitration, applies only to members, not to FINRA associated persons.

The Susoeffs argue *Ronay*, *supra,* 216 Cal.App.4th 830, can be distinguished and should not be followed in this instance. They contend the pivotal fact

---

[5]     For this reason we need not address the Susoeffs' contention Michie was not also an intended third party beneficiary of the arbitration agreement because unlike the agreement in *Ronay* that called for arbitration of disputes with "[CapWest], its officers, directors, agents, registered representatives and/or employees for me (us)'" (*Ronay*, *supra,* 216 Cal.App.4th at p. 835), the arbitration clause here only referred to "controversies which may arise *between us*" and did not specifically include registered representatives within the definition of "us."

17

in *Ronay* was that Tweed, "has at all relevant times been registered with FINRA as an associated person of a securities broker-dealer" (*id.* at p. 834), and was "an associated person in good standing with FINRA[.]" (*Id.* at p. 836.) The Susoeffs ask us to take judicial notice of "Broker Check Report" they obtained from the FINRA website on May 8, 2014, stating Michie is no longer a registered representative of a FINRA member securities broker and his last broker registration ended in June 2010. The Susoeffs argue Michie is no longer in good standing or associated with FINRA and thus *Ronay's* reasoning does not apply. Instead, they argue we should follow an appellate opinion from New Mexico, *Medina v. Holguin* (N.M. Ct. App. 2008) 145 N.M. 303, 305 (*Medina*), which held "an associated person may not compel arbitration with a customer after the lapse of the member's NASD membership." *Ronay* rejected *Medina* for a number of reasons, including the distinguishing fact that in *Medina,* the associated person's NASD registration was suspended when the member's NASD membership lapsed, but in *Ronay* the associated person maintained FINRA registration. (*Ronay*, *supra,* 216 Cal.App.4th at p. 845.)

Michie did not oppose the Susoeffs' request for judicial notice but responded with his own request that we take judicial notice of "Investment Adviser Representative Public Disclosure Report" obtained from the FINRA website on May 28, 2014, showing Michie is registered with FINRA as an "investment adviser representative" and has been so registered since 2006. The Susoeffs do not oppose Michie's request for judicial notice. We grant both requests for judicial notice. (Evid. Code, §§ 452, subd. (c), 459, subd. (a); see *El Escorial Owners' Assn. v. DLC Plastering, Inc*. (2007) 154 Cal.App.4th 1337, 1350 [taking judicial notice of certificate of revivor certifying corporation was now "'in good standing'"].) Inasmuch as the record demonstrates Michie has maintained his FINRA registration at all relevant times, the distinction the Susoeffs make is inapplicable.

18

In sum, applying the reasoning of *Ronay*, *supra,* 216 Cal.App.4th 830, we conclude Michie may enforce the arbitration clause of the customer account agreement between the Susoeffs and Welton Street. Moreover, even though Welton Street became defunct and under FINRA Rule 12202 lost its right to enforce the arbitration clause, Michie nevertheless retained his rights to do so.

## C. The Order Denying the Petition to Compel Arbitration May Not Be Affirmed on Alternative Grounds

Invoking the rule that "a ruling or decision correct in law will not be disturbed on appeal merely because it was given for the wrong reason" (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 568), the Susoeffs contend that even Michie may enforce the arbitration agreement, we should nonetheless affirm the order denying Michie's petition to compel arbitration for various other reasons. We address each in turn.

### 1. Fraud in the Execution

The Susoeffs contend they are entitled to rescind the arbitration agreement pursuant to Code of Civil Procedure section 1281.2, subdivision (b), because of fraud in the execution of the arbitration agreement. They contend they did not read the customer account form when they signed it and were unaware it contained an arbitration provision. Furthermore, they argue Michie stood in a fiduciary relationship to them as both their real estate broker and attorney, and therefore he had a duty to disclose to them the customer account form contained an arbitration agreement. The Susoeffs' claimed failure to read and understand the arbitration clause is no defense to its enforcement.

"'Ordinarily, one who accepts or signs an instrument, which on its face is a contract, is deemed to assent to all its terms, and cannot escape liability on the ground that he has not read it. If he cannot read, he should have it read or explained to him.' [Citation.]" (*Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158, 163; see *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710 ["general

19

rule [is] that one who assents to a contract is bound by its provisions and cannot complain of unfamiliarity with the language of the instrument"].)

The Susoeffs argue the alleged fiduciary relationship between them and Michie imposed a higher standard on him with regard to the customer account form. They rely on *Brown, supra,* 168 Cal.App.4th 938, for the proposition that because there was a fiduciary relationship, Michie had an obligation to draw their attention to the arbitration clause. In *Brown*, the finances of a frail elderly couple (the wife in her 80s, the husband in his 90s, in failing health, and legally blind) (*id.* at p. 946) were being completely managed by the banks' vice president "relationship manager" who induced them to rely on her for their financial well-being by making biweekly visits to their home to manage their financial paperwork and pay their bills, and introducing them an estate attorney, an accountant, and a financial consultant. Eventually, the bank vice president assisted the couple in opening a brokerage account with one of the bank's stock brokers to reallocate their investments. Knowing of the couples' frailty and physical limitations, and particularly the husband's blindness that prevented him from being able to read the document, the bank's stock broker had the couple sign a 17-page account form containing an arbitration provision. He did not read the documents to them or point out that it contained an arbitration agreement. The couple was not given an opportunity to take the documents home before signing them. (*Id.* at pp. 960-961.)

When the investments failed and the elderly couple sued the bank, the bank filed a petition to compel arbitration. The trial court denied the petition finding the arbitration agreement was unconscionable. (*Brown, supra,* 168 Cal.App.4th at p. 952.) As to the plaintiffs' argument the arbitration agreement was subject to rescission due to fraud, the trial court found there was a fiduciary relationship between the bank and the plaintiffs but whether there was fraud was for "'a jury panel to decide.'" (*Ibid.*)

The appellate court reversed the order denying the petition to compel arbitration finding the arbitration agreement was not unconscionable but also finding the

matter had to be remanded for the trial court to decide the issue of fraud because "[a] trial court ruling on a petition to compel arbitration must resolve the factual issues raised by the petition, not simply determine whether factual disputes exist. [Citation.] There is no right to a jury trial on the issue of whether arbitration agreements should be specifically enforced. [Citation.]" (*Brown, supra,* 168 Cal.App.4th at pp. 952-953.) In discussing the fraud defense, the court observed that when a party claims there was fraud in the execution of a contract (i.e., the party did not know what he/she was signing), reasonable reliance is a necessary element. "This issue usually arises when the plaintiff failed to read the terms of the contract, relying instead on the defendant's representation as to the effect of the contract. Generally, it is *not reasonable* to fail to read a contract; this is true even if the plaintiff relied on the defendant's assertion that it was not necessary to read the contract. [Citation.] Reasonable diligence requires a party to read a contract before signing it. [Citation.] This presumes, however, that the parties were dealing *at arm's length*. When the parties are in a fiduciary relationship, the same degree of diligence is not required of the nonfiduciary party. [Citation.] If the defendant is in a fiduciary relationship with the plaintiff which requires the defendant to explain the terms of a contract between them, the plaintiff's failure to read the contract would be reasonable. [Citations.]" (*Id.* at p. 959, fn. omitted.)

The appellate court concluded there was substantial evidence supporting the trial court's finding of a fiduciary relationship given the "unique" facts of the case (e.g., frail elderly customers whom the bank knew relied completely on the bank vice president to handle all their financial affairs etc.). (*Brown, supra,* 168 Cal.App.4th at p. 960.) And it concluded the scope of the bank's duty could "encompass[] a duty *not* to treat the execution of the [a]greement as an arm's-length transaction, and to instead explain the material terms of the [a]greement to them[,]" which could include "oral disclosure of the arbitration clause." (*Brown, supra,* 168 Cal.App.4th at p. 961.)

21

*Brown* does not aid the Susoeffs for the simple reason that in this case, the trial court specifically decided the issue of fraud. Judge Schumann in granting Michie's petition to compel arbitration ruled against the Susoeffs on their claim of fraud and rejected their contention the existence of an arbitration agreement was somehow hidden from them. When Judge Griffin subsequently reconsidered Judge Schumann's ruling and denied Michie's petition to compel arbitration, he made clear he was not reconsidering any rulings concerning the Susoeffs' defenses to enforcement of the arbitration clause. His ruling was based solely on the conclusion Welton Street's loss of FINRA membership made the arbitration agreement unenforceable by Michie.

The Susoeffs criticize the trial court for failing to first decide the threshold issue of whether Michie was a fiduciary before finding no fraud in the execution. But "we accept the trial court's resolution of disputed facts when supported by substantial evidence; we presume the court found every fact and drew every permissible inference necessary to support its judgment. [Citation.]" (*Brown, supra,* 168 Cal.App.4th at p. 953.) Thus, we must presume the trial court found that even if Michie was a fiduciary, he satisfied his duty by disclosing the existence of the arbitration agreement. Substantial evidence supports the trial court's conclusion there was no fraud. In ruling, the trial court specifically stated it was resolving all conflicts in the evidence in favor of Michie who the court found to be more credible. Michie declared he discussed the Welton Street documents with George in detail, encouraged the Susoeffs to read all the documents, *expressly told them about the arbitration clause*, and never told them they had to rush to sign the documents. Additionally, nothing in the record suggests the arbitration clause was buried in a mass of documents. The record shows it was part of a six-page fax transmission from Michie to the Susoeffs on November 15, 2005, after speaking to George on the telephone about the investments. The Welton Street acknowledgement form was three pages in length. The customer account form was two pages. The first (front) page, in bold print above the signatures read, "Acknowledgement of Information

22

Provided & Pre-Dispute Arbitration Clause" followed by the statement, "The information stated above which I have provided to you is true and correct, further, I acknowledge that I have read the pre-dispute arbitration clause printed in full on the reverse side of this document and accept the clause in its entirety."  The reverse side of the customer account form (page two) contained nothing but the arbitration clause, clearly titled as such. Michie declared that although he did not read the entire arbitration agreement to George over the telephone, he told him that as to the documents he was faxing, "the Acknowledgment of Information Provided & Pre-Dispute Arbitration Clause . . . was their agreement to the Pre-Dispute Arbitration Clause that appeared on the reverse side of the [c]ustomer [a]ccount [f]orm and which required them to arbitrate disputes between us."  Michie told George he was faxing the documents so the Susoeffs "could read and review them before deciding to sign the agreement."  The next morning, Michie received via fax from the Susoeffs the signed documents and the fax transmission included the Pre-Dispute Arbitration Clause page, evidencing the Susoeffs had received it in the first place to read and review.  In short, substantial evidence supports the trial court's finding there was no basis for rescission of the arbitration agreement.

*2. Business and Professions Code sections 6147 and 6148*

The Susoeffs contend the customer account form is void, and therefore the arbitration clause contained therein is unenforceable, because Michie is an attorney and the customer account form is in effect a lawyer's fee agreement.  They reason that opening a brokerage account with Welton Street was necessary for them to purchase the TIC securities and purchasing the securities was a prerequisite for Michie to receive his broker's commission.  They argue the commissions Michie received from their purchase of the TIC securities were in effect the attorney fees he received for legal services. Accordingly, they argue, the Welton Street customer account form had to comply with Business and Professions Code sections 6147 and 6148 regarding the contents of attorney retainer agreements.

23

Even assuming there was any merit to the Susoeffs' contention the Welton Street customer account form constitutes an attorney retainer agreement, failure to comply with Business and Professions Code sections 6147 and 6148 does not render attorney fee agreements *void*. Rather, it renders such agreements "*voidable* at the [client's] option," but the attorney is still entitled to collect a reasonable fee. (Bus. & Prof. Code, §§ 6147, subd. (b); 6148, subd. (c).) The Susoeffs did not raise this argument below and arguments raised for the first time on appeal are considered waived. (See *Coleman v. Satterfield* (1950) 100 Cal.App.2d 81, 84 [voidability of contract may not be raised for first time on appeal]; see also *Jovine v. FHP, Inc.* (1998) 64 Cal.App.4th 1506, 1527, fn. 26, 1529-1530 [doctrine of waiver applies to voidable acts].) Accordingly, we decline to consider the point further.

*3. Scope of Arbitration Agreement*

The Susoeffs argue that not all of the causes of action of their complaint fall within the scope of the arbitration agreement. They argue causes of action against Michie for legal malpractice, breach of attorney fiduciary duty, fraud, and violation of the Unfair Competition Law would not fall within the arbitration agreement. The Susoeffs did not raise this argument below, but we have the discretion to consider for the first time on appeal an issue of law based on undisputed facts. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 24; see also *Larkin v. Williams, Woolley, Cogswell, Nakazawa & Russell* (1999) 76 Cal.App.4th 227, 229 (*Larkin*) [where scope of arbitration clause based solely on construction of unambiguous contractual terms, review is de novo].) Out of an abundance of caution, we exercise that discretion here.

"'"[T]here is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate."'" (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744.) "'[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit.'" (*AT & T Tech., Inc. v. Communications Workers* (1986) 475 U.S. 643, 648;

24

*Elijahjuan, supra,* 210 Cal.App.4th at p. 26.) Nonetheless, in view of the strong public policy in favor of arbitration, "any doubt as to whether plaintiff's claims come within the arbitration clause must be resolved in favor of arbitration. [Citations.]" (*EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1320-1321 (*EFund Capital Partners*).) Moreover, "'This strong public policy has resulted in the general rule that arbitration should be upheld "unless it can be said with assurance that an arbitration clause is not susceptible to an interpretation covering the asserted dispute. [Citation.]" [Citation.]' [Citations.] *The burden is on the plaintiff, the party opposing arbitration, to show that the arbitration clause cannot be interpreted to cover the claims in the . . . complaint.* [Citations.]" (*Id.* at p. 1321, italics added.)

If an arbitration clause is broadly worded, practically any claim, including a tort action, is arbitrable. (See Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2013) ¶ 5:215, pp. 5-163 to 5-165 (rev. # 1, 2013).) The most common "'broad form'" arbitration agreement covers all "claims or disputes *arising out of or relating to*" the agreement. (Knight et al., supra, ¶ 5:215.4, p. 5-164; see *Larkin*, *supra*, 76 Cal.App.4th at p. 230.) For example, in *Fagelbaum & Heller LLP v. Smylie* (2009) 174 Cal.App.4th 1351, 1364, a law firm leased office space from a client it was representing in litigation. When the client was unable to pay the legal fees, he agreed to reduce the debt by allowing the law firm a credit against the monthly rent. An arbitration agreement in the lease stated "any controversy or claim arising out of or relating to" the lease would be settled by binding arbitration. The court held the provision was sufficiently broad to require arbitration of the client's malpractice claim against the law firm by which the client asserted the law firm could no longer pay rent with offsets. Next on the spectrum are arbitration provisions covering "[a]ll disputes arising in connection with this [a]greement[.]" (*Simula, Inc. v. Autoliv, Inc.* (9th Cir. 1999) 175 F.3d 716, 720, italics omitted.) This phrase "'does not limit arbitration to the literal interpretation or performance of the contract. It embraces every dispute between the parties having a

25

significant relationship to the contract regardless of the label attached to the dispute.' [Citation.]"  (*Id.* at p. 720.)  The provision is "sufficiently broad in scope to include claims for unfair trade practices, libel, . . . defamation[,]" antitrust violations, and claims of misrepresentation.  (*Ibid.*)

The Susoeffs concede the arbitration agreement contained in the customer account form is very broad.  It requires arbitration of "all controversies which may arise between us including but not limited to those involving any transaction or the construction, performance, or breach of this or any other agreement between us, whether entered into prior, or on [*sic*] subsequent to the date hereof, shall be determined by arbitration."

In determining if the dispute falls within the scope of the arbitration clause, it is the factual basis for the claims, not the form of the pleadings that controls.  (*Izzi v. Mesquite Country Club* (1986) 186 Cal.App.3d 1309, 1316.)  Although some of the Susoeffs' causes of action were based on the claimed attorney-client relationship between them and Michie, the gravamen of their entire complaint has its roots in Michie's placement of the Susoeffs in the TIC investments that failed.  They alleged Michie's preexisting fiduciary relationship with them (as their real estate broker and their attorney), imposed a greater responsibility on Michie to ensure the investments were appropriate for their circumstances and their investment goals, and to make appropriate disclosures about the nature and risk of the investments.  Although the complaint contains conclusory allegations Michie was their lawyer and performed legal services, the only services described are being the real estate broker on sale of the ranch (about which there are no claims of wrongdoing), and recommending and brokering their purchase of the TIC investments.  At its core, the complaint is about allegedly bad investment advice and lack of adequate disclosures about the investments they were purchasing.  Accordingly, the arbitration agreement requiring arbitration of "all controversies which may arise

26

between us," extends to the disputes alleged in the Susoeffs' complaint. (*EFund Capital Partners, supra,* 150 Cal.App.4th at p. 1326.)

FINRA Rule 12200, upon which the Susoeffs' argument is premised, does not compel a different result. FINRA Rule 12200 refers to arbitration of disputes between a customer and a member or associated person of a member that "arise[] *in connection with the business activities* of the member or the associated person . . . ." (Italics added.) *Valentine Capital, supra,* 174 Cal.App.4th 606, considered similar language contained FINRA Rule 13200, which requires arbitration of disputes between or among FINRA members and associated persons "if the dispute arises out of the business activities of a member or an associated person." *Valentine Capital* concluded the matters falling within the mandatory arbitration rule had to have "some nexus to the activity actually regulated by FINRA[,]" (*id.* at p. 616), in other words they must arise out of the business activities as an associated person of a FINRA member. "To resolve this question, we consider the pleadings and evidence before the trial court." (*Id.* at p. 617.) As already noted, the gravamen of the Susoeffs' complaint pertains to Michie's activities as a securities broker and his placement of the Susoeffs in the TIC investments that failed. As such, even though they alleged fidiciary duties based on an alleged attorney client relationship, the dispute was in connection with the business activities of Michie as an associated person of a FINRA member. As noted above, it was the Susoeffs' burden to demonstrate the arbitration clause cannot be interpreted to cover the causes of action they now assert are not arbitrable (*EFund Capital, supra,* 150 Cal.App.4th at p. 1321), and they have not carried that burden.

*4. Code of Civil Procedure section 1281.2, subdivision (c)*

The Susoeffs contend we should affirm the order denying arbitration under Code of Civil Procedure section 1281.2, subdivision (c), which allows the trial court to deny a petition to arbitrate if, "A party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same

transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact." The Susoeffs contend there is the potential for inconsistent rulings concerning the Brookstreet Defendants—the only other defendants still remaining in this action.

This argument was not raised in the Susoeffs' motion that resulted in the ruling before us on this appeal (i.e., the Susoeffs' motion to lift the arbitration stay and reconsider the order granting Michie's petition to compel arbitration). The argument was raised by the Susoeffs in their opposition to Michie's original petition to compel arbitration with regard to the now dismissed Versus Defendants and rejected by the trial court, but the Susoeffs have not suggested that ruling was an abuse of discretion. (See *Fitzhugh v. Granada Healthcare & Rehabilitation Center, LLC* (2007) 150 Cal.App.4th 469, 475 [trial court ruling under Code of Civil Procedure § 1281.2, subd. (c), reviewed for abuse of discretion and reverses only if it "exceeded the bounds of reason"].) In this appeal, the Susoeffs for the first time make the Code of Civil Procedure section 1281.2, subdivision (c), argument with regard to the Brookstreet Defendants. Because the argument was not raised below, we decline to consider it on appeal. Moreover, we note the argument is based on the allegations against Michie contained in a pleading that was never filed. The Susoeffs' filed a first amended complaint, but they contend they filed the wrong version of that pleading. And when they filed a motion in the trial court to lift the stay resulting from *this* appeal in order to strike the erroneously filed first amended complaint and file a corrected version, their motion was denied without prejudice. The Susoeffs argue the unfiled version of their first amended complaint alleges that after Michie left Welton Street, he became a registered representative of Brookstreet, a different securities brokerage firm, and while working for Brookstreet, Michie continued to represent to the Susoeffs the TIC investments were suitable for them. The Susoeffs have made no attempt at explaining how their claims

28

against Brookstreet and Michie involve common issues of law and fact. Accordingly, we decline to consider this argument further.

DISPOSITION

The order denying the petition to compel arbitration is reversed, and the matter is remanded to the superior court for further proceedings consistent with this opinion. Appellants shall recover costs on appeal.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.

MOORE, J., Concurring.

In addition to concurring in the opinion for all the reasons stated therein, I also concur because a second judge cannot undo prior judicial action. (*Markwell v. Sykes* (1959) 173 Cal.App.2d 642; Code Civ. Proc., § 1008.)


MOORE, J.

1