Filed 4/29/16  East Coast Foods v. Kelly, Lowry & Kelley CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| EAST COAST FOODS, INC., ET AL., | B262679 |
| Plaintiffs and Appellants, | Los Angeles County |
| v. | Super. Ct. No. BC499211 |
| KELLY, LOWRY & KELLEY, LLP, ET AL., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge.  Affirmed.

Rostam Law, Inc., Carlos A. De La Paz and Glen Mertens for Plaintiffs and Appellants.

Nemecek & Cole, Frank M. Nemecek, Mark Schaeffer and Jonathan M. Starre for Defendants and Respondents.

**INTRODUCTION**

Plaintiffs East Coast Foods, Inc. and its president and director, Herbert Hudson, hired attorney John E. Kelly and his law firm, Kelly, Lowry & Kelley, LLP (collectively, defendants) to represent them in a copyright-infringement lawsuit. The fee agreement included a clause requiring the parties to arbitrate "any dispute" regarding "any billing" or "the rendering by [defendants] of legal services[.]" After losing in federal court, plaintiffs refused to pay defendants the remaining balance for legal services. Instead, plaintiffs sued them for legal malpractice, and defendants filed a cross-complaint for unpaid fees.

Plaintiffs appeal from the judgment entered against them after the trial court granted defendants' petition to confirm an arbitration award of $427,409.99 in unpaid attorney fees, costs, and interest. Plaintiffs contend the arbitration provision in the parties' fee agreement was unenforceable because it was not adequately disclosed or explained to them, and the trial court therefore erred in compelling them to arbitrate their disputes. We disagree and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**1.** **The Underlying Copyright Litigation and Defendants' Legal Representation**

Herbert Hudson is the director and president of East Coast Foods and assorted other entities. Through these businesses, Hudson operates Roscoe's House of Chicken 'N Waffles, the well-known Southern California restaurant chain.

For many years, Edward Siegler has served as East Coast Foods's general counsel and Hudson's personal attorney.[1] Among other duties, Siegler supervises and communicates with the outside law firms that plaintiffs hire to represent them in discrete legal matters. In accordance with this practice, plaintiffs retained defendants to represent them in a variety of legal matters from 1997 through 2012. During that time, Siegler was defendants' point of contact with plaintiffs. Defendants sent all case-related

---

[1] Siegler is not a party to this appeal or the underlying lawsuit.

2

documents, communications, and billing statements to Siegler, and Siegler, in turn, coordinated with Hudson.

The American Society of Composers, Authors and Publishers (ASCAP) is a membership association that licenses and distributes royalties for non-dramatic public performances of its members' copyrighted works. On March 25, 2009, eight of its members sued plaintiffs in federal court alleging that their copyrighted songs were publicly performed at one of plaintiffs' properties.[2] The complaint asserted that plaintiffs were liable for copyright infringement because they had failed to seek or obtain a license from the artists or ASCAP before performing the copyrighted music. Each artist sought statutory damages of between $750 and $30,000.[3]

Plaintiffs contend—and the legal bills reflect—that defendants began representing them in the copyright case on or before April 8, 2009. On April 15, 2009, Kelly spoke with Hudson and Siegler by phone. During the call, Kelly said he would send Siegler a retainer agreement to review with Hudson. Later that day, Kelly sent Siegler a follow-up letter. He wrote, " 'We appreciated the informative telephone chat today with you and Herb Hudson. . . . Aaron and/or I should soon discuss with you a fee arrangement for the clients in representing them in this civil action. . . . [We] [l]ook forward to coordinating with you in implementing a defense in this case.' "

The following day, April 16, 2009, Kelly wrote to Siegler again. This time, he included a proposed fee agreement. The cover letter explained, "Referring to our communications over the past couple of weeks and our informative telephone conversation Tuesday with Herb, we have generally agreed upon a relationship by which our law firm will represent the two Defendants designated in the caption of the

---

[2]     *Range Road Music, Inc., et al. v. East Coast Foods, Inc., et al.*, No. 09-CV-02059-CAS (AGR) (C.D.Cal. 2009) (copyright case).

[3]     ASCAP made several attempts to settle the matter without litigation. In 2007, ASCAP offered to forego litigation if Roscoe's would purchase a license to avoid future infringements, and in 2008, ASCAP offered to settle the whole matter for $10,000. Hudson apparently ignored these overtures.

above-identified litigation, i.e., Mr. Hudson and East Coast Foods, Inc. As you know, under rules of the California Bar, attorneys are obligated to describe the basics of an attorney-client and related business relationship and in that regard, I am sending <u>directly to you</u> concurrently by email and regular mail, our proposed Engagement Agreement with the clients." After discussing matters relating to the litigation and defendants' fees, the letter emphasized, "Again, we are sending this letter and the proposed Engagement Agreement with the clients, directly and only to you for review, comments—and assume you will promptly coordinate with Herb. [¶] We invite your comments and are open to proposed modifications—but as you certainly will know, this is a rather standard and basic Engagement Agreement." The letter closed, "We look forward to hearing from you and Herb and working closely with you in defending this case. Should you desire to join us as attorney of record, let me know."

The enclosed fee agreement was dated April 16, 2009, and addressed to Hudson. The agreement's purpose was described as follows: "This letter sets forth our agreement regarding retention of this firm by East Coast Foods, Inc. and you, in the above-identified litigation and has been structured for signature by you as an officer of East Coast Foods, Inc. and personally. Your company, East Coast Foods, Inc. and you as an individual, are named as the Defendant in the [copyright case]." The agreement was three pages long, and contained 11 numbered paragraphs. Paragraph seven provided: "If any dispute arises between you and this firm with respect to any billing or billings issued by this firm or the rendering by us of legal services, we both agree that the dispute shall be submitted to mandatory binding arbitration. Such arbitration shall be conducted in accordance with the rules of the State Bar of California, before a single neutral arbitrator. The arbitration shall be conducted under the auspices of Judicial Arbitrating and Mediation Service (JAMS) Los Angeles Office. JAMS shall appoint the arbitrator upon written demand of any party to this letter agreement. The decision of the arbitrator shall be final and binding on the parties hereto. The arbitrator shall have the discretion to order that the costs of arbitration, including his or her fees, other costs, and reasonable attorneys' fees shall be borne by the losing party." The agreement

4

concluded, "Please feel free to contact me if you have questions or comments in regard to this Engagement Agreement.  We request at this time an initial retainer deposit of $12,500.00.  [¶]  If the above terms are acceptable in all respects, then please sign this letter or a copy of this letter on behalf of yourself and the corporations, and return an executed copy to our office as soon as possible."

Kelly followed up with Siegler by telephone the following day.  Siegler confirmed that he had received the proposed fee agreement and said it " 'looks OK.' " Siegler told Kelly he would have Hudson sign it.  Though Hudson eventually signed the agreement, the timing and circumstances of his signature are unclear.  Defendants contend Hudson signed the agreement sometime in April 2009 in the presence of Michael DiNardo, an attorney at the Kelly firm.  However, the firm's billing statements do not indicate that DiNardo—or any of the other attorneys—met personally with Hudson during that period, and Hudson did not recall signing the agreement.  In any event, the parties agree that by May 11, 2009, Hudson had signed the fee agreement and returned it to defendants.

From 2009 through 2012, defendants vigorously defended plaintiffs in the copyright case.  After losing a motion for summary judgment in the federal district court, plaintiffs appealed to the Ninth Circuit Court of Appeals, where they also lost. Plaintiffs submitted a petition for rehearing en banc, which was denied.  Finally, plaintiffs filed a petition for certiorari with the United States Supreme Court.  The petition was denied.

By the end of the federal litigation, plaintiffs owed defendants $81,591.90 in unpaid attorney's fees.  While plaintiffs had always paid their bills promptly in the past, by October 2012, they had become unresponsive.

### 2.     The Lawsuit and Motion to Compel Arbitration

On January 16, 2013, plaintiffs filed a complaint against defendants alleging causes of action for legal malpractice, breach of fiduciary duty, and declaratory relief. In essence, the complaint alleged defendants did not adequately research the law in the copyright case, which resulted in a protracted trial and eventual ruling adverse to

5

plaintiffs. The complaint sought compensatory damages of $970,000 for attorney's fees and costs expended in the underlying action, general and punitive damages according to proof, and a declaration that the defendants' services in the underlying action were worthless.

On April 2, 2013, defendants answered the complaint and asserted the dispute was subject to mandatory binding arbitration. They also filed a cross-complaint alleging causes of action for breach of written contract, open book account, account stated, and quantum meruit. The cross-complaint sought $82,446.90 in past-due payments for legal services. On June 12, 2013, the trial court granted defendants' motion to strike the claim for attorney's fees and punitive damages in the complaint, but denied their request to strike the references to the Rules of Professional Conduct.

On October 3, 2013, defendants filed a motion to compel arbitration under the fee agreement. They argued the fee agreement, which Hudson had signed in April 2009, required the parties to arbitrate plaintiffs' claims and defendants' cross-claims. Plaintiffs opposed the motion. Plaintiffs argued that the current malpractice claims were not subject to the arbitration provision because defendants developed the deficient legal theories in the copyright case in April 2009, a month before Hudson signed the fee agreement, and those deficient theories are the basis for the current malpractice claims. They also argued Hudson was unaware of the arbitration clause, the clause should be construed not to apply to malpractice claims, and defendants did not fulfill their duty to plaintiffs to explain the existence and nature of the arbitration clause.

On October 25, 2013, the court granted the motion to compel and stayed the proceedings. The court concluded defendants had established the existence of "an enforceable arbitration agreement between the parties which covers all of the disputes alleged in the complaint and cross-complaint. Plaintiffs' opposition is without merit and plaintiff Hudson's declaration lacks credibility. . . . [¶] Plaintiffs' defense is now that Hudson did not know what he was signing. Hudson declares that he is unsophisticated in legal matters and depends on professionals for advice. Shockingly, Hudson fails to advise the court that one of those professionals is attorney Siegler who was sent the

6

retainer agreement along with defendants' invitation to discuss it further or to propose modifications. Thereafter Siegler advised defendants that the agreement looked okay and said he would have Hudson sign it. [¶] Based on all of the evidence submitted, the court finds that plaintiff Hudson received the retainer agreement, reviewed it with attorney Siegler, understood the terms of the agreement, including the arbitration agreement, and signed the agreement signifying his acceptance of its terms."

The parties proceeded to binding arbitration on all claims. After four days of hearings, the arbitration award was filed on October 28, 2014. The arbitrator rendered a decision in favor of defendants on both the complaint and the cross-complaint. She awarded them $97,112.90 in damages, $279,995.50 in attorney's fees, and $40,654.30 in costs.

On November 12, 2014, defendants moved to confirm the arbitration award and enter judgment in the trial court. Plaintiffs did not oppose the motion but reserved their right to appeal the court's earlier order granting the motion to compel. On January 15, 2015, the court confirmed the arbitration award and entered judgment for defendants. Plaintiffs timely appealed.

## CONTENTION

Plaintiffs contend the arbitration provision in the fee agreement is unenforceable because it was not adequately disclosed or explained to them.

## DISCUSSION

### 1.     Applicable Law and Standard of Review

"The California Arbitration Act (Code Civ. Proc., § 1280 et seq.) compels the enforcement of valid arbitration agreements. [Citations.] Section 1281 states: 'A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract.' 'The statutory scheme reflects a "strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution." [Citation.]' [Citation.]

7

"A party petitioning the court to compel arbitration [citation] bears the burden of proving by a preponderance of evidence the existence of an arbitration agreement. A party opposing the petition bears the burden of proving by a preponderance of evidence any fact necessary to its defense. [Citation.] The trial court sits as the trier of fact for purposes of ruling on the petition. [Citation.]" (*Mt. Holyoke Homes, L.P. v. Jeffer Mangels Butler & Mitchell, LLP* (2013) 219 Cal.App.4th 1299, 1307-1308 (*Mt. Holyoke*).) If the court determines an agreement to arbitrate the controversy exists, it must grant the petition to compel arbitration. (Code Civ. Proc., § 1281.2; *Mendez v. Mid-Wilshire Health Care Center* (2013) 220 Cal.App.4th 534, 541.)

The fee agreement in this case was three pages long and contained 11 numbered paragraphs. Paragraph seven provided: "If any dispute arises between you and this firm with respect to any billing or billings issued by this firm or the rendering by us of legal services, we both agree that the dispute shall be submitted to mandatory binding arbitration." This provision unambiguously encompasses all financial disputes between the parties—and as we discuss below, plaintiffs have forfeited any argument that it does not also apply to claims of professional negligence. Plaintiffs do not dispute that Hudson signed the agreement on their behalf, and do not argue that the arbitration "provision is inconspicuous or procedurally unconscionable in any way. Nor do they argue that the provision is one-sided or substantively unconscionable. Instead, they argue that Defendants had a duty to disclose and explain the significance of the arbitration provision and the failure to satisfy such duty invalidates the arbitration agreement. This is a claim of fraud in the execution, also known as fraud in the inception." (*Mt. Holyoke*, *supra*, 219 Cal.App.4th at p. 1308.)

"When a plaintiff alleges fraud in the inducement, the plaintiff is asserting that it understood the contract it was signing, but that its consent to the contract was induced by fraud. In contrast, when a plaintiff alleges fraud in the execution, the plaintiff is asserting that it was deceived as to the very nature of contract execution, and did not know what it was signing. A contract fraudulently induced is voidable; but a contract fraudulently executed is void, because there never was an agreement." (*Brown v.*

8

*Wells Fargo Bank, N.A.* (2008) 168 Cal.App.4th 938, 958 (*Brown*).)  This issue often arises when a plaintiff signs a contract without reading it.  Because it is generally unreasonable to fail to read a contract, if a plaintiff has "a reasonable opportunity to discover the true terms of the contract" before signing it, the contract is not void due to fraud.  (*Id.* at p. 959.)  However, "[i]f the defendant is in a fiduciary relationship with the plaintiff which requires the defendant to explain the terms of a contract between them, the plaintiff's failure to read the contract would be reasonable."  (*Ibid.*)  "In such a situation, the defendant fiduciary's failure to perform its duty would constitute constructive fraud (citation), the plaintiff's failure to read the contract would be justifiable (citation), and constructive fraud in the execution would be established." (*Ibid.*; *Mt. Holyoke*, *supra*, 219 Cal.App.4th at p. 1308.)

The existence and scope of a fiduciary duty is a question of law that we review de novo.  (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213.)  However, "the factual background against which we [answer that question] is a function of a particular case's procedural posture."  (*Id.* at p. 1214.)  Thus, to the extent the court's decision below "turned on the resolution of conflicts in the evidence or on factual inferences to be drawn from the evidence, we consider the evidence in the light most favorable to the trial court's ruling and review the trial court's factual determinations under the substantial evidence standard.  [Citation.]"  (*Baker v. Osborne Development Corp*. (2008) 159 Cal.App.4th 884, 892.)

### 2.    The court properly compelled arbitration.

As discussed, "[a] cardinal rule of contract law is that a party's failure to read a contract, or to carefully read a contract, before signing it is no defense to the contract's enforcement."  (*Desert Outdoor Advertising v. Superior Court* (2011) 196 Cal.App.4th 866, 872 (*Desert Outdoor Advertising*); accord, *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710 ["one who assents to a contract is bound by its provisions and cannot complain of unfamiliarity with the language of the instrument"].)

While this elementary principle of contract law is not vitiated because the contract was for legal services, we are mindful that " '[t]he relation between attorney

9

and client is a fiduciary relation of the very highest character, and binds the attorney to most conscientious fidelity—*uberrima fides*.' " (1 Witkin, Cal. Procedure (5th ed. 2008) Attorneys § 90, p. 125, quoting *Cox v. Delmas* (1893) 99 Cal. 104, 123.) In this case, the parties had a long-established attorney-client relationship by the time Hudson signed the fee agreement, which created fiduciary obligations and ethical responsibilities for defendants toward plaintiffs. (See *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1148.) However, absent exceptional circumstances not present here, defendants had no duty to call attention to or explain the terms of that agreement. (See *Desert Outdoor Advertising*, *supra*, 196 Cal.App.4th at pp. 873–874; *Ramirez v. Sturdevant* (1994) 21 Cal.App.4th 904, 913 ["[I]n general, the negotiation of a fee agreement is an arm's-length transaction. [Citations.] [The lawyer] accordingly was entitled to negotiate the terms on which he would accept employment as he wished, and absent issues of duress, unconscionability, or the like, [the client] has no cause to complain that the terms [the lawyer] negotiated were favorable to him."]; see generally *Fletcher v. Davis* (2004) 33 Cal.4th 61, 70.) Thus, in the absence of duress or fraud, "[a]n attorney may ethically, and without conflict of interest, include in an initial retainer agreement with a client a provision requiring the arbitration of both fee disputes and legal malpractice claims." (*Powers v. Dickson, Carlson & Campillo* (1997) 54 Cal.App.4th 1102, 1109 (*Powers*).)

Notwithstanding *Desert Outdoor Advertising*, *Powers*, and *Mt. Holyoke*—all of which concern new fee agreements executed in preexisting attorney-client relationships—plaintiffs argue that "[f]ee agreements made while the attorney-client relationship exists are subject to the presumption of undue influence." In support of this proposition, plaintiffs cite to *Gleason v. Klamer* (1980) 103 Cal.App.3d 782, 787, a case involving an account stated, not a fee agreement. As with other attorney-client transactions involving ownership, possessory, or other pecuniary interests, "an account stated is subject to a presumption of undue influence when entered between an attorney and client during their fiduciary relationship." (*Id.* at p. 787.) Plaintiffs' other citations also involve business transactions or property transfers between attorneys and their

10

clients.  (See *Trafton v. Youngblood* (1968) 69 Cal.2d 17 [account stated]; *Hawk v. State Bar* (1988) 45 Cal.3d 589, 601 [fee agreement in the form of a note secured by a deed of trust on a client's property requires attorney "to fully explain such transactions, to offer only fair and reasonable terms, to give the client a copy of the agreement, and to give the client an opportunity to seek independent legal advice[]" because it is reasonably foreseeable the note may become detrimental to the client]; *Rebmann v. Major* (1970) 5 Cal.App.3d 684, 688 [attorney advised ill, elderly couple to deed property to attorney's children].)

Unlike attorney-client business transactions, the presumption of undue influence does not typically apply to standard engagement agreements—even when they are executed after the formation of the attorney-client relationship.  (*Walton v. Broglio* (1975) 52 Cal.App.3d 400, 404.)  To the extent an attorney owes an existing client a heightened duty when negotiating a new fee arrangement, he satisfies that duty by assuring the agreement is fair and openly made, with the client's full knowledge of its terms and consequences, and of his legal rights.  (*Mt. Holyoke*, *supra*, 219 Cal.App.4th at pp. 1309–1310.)  If the contract contains ambiguous provisions, those provisions will be construed against the drafter/attorney.  (*Severson & Werson v. Bolinger* (1991) 235 Cal.App.3d 1569, 1573.)[4]  The attorney does not, as plaintiffs suggest, have to explain the agreement's provisions personally.  (See *Mt. Holyoke*, *supra*, at pp. 1308-1310.)

Here, the arbitration provision was clear and conspicuous; it was not buried in a lengthy or technical contract.  The entire fee agreement was only three pages long and the arbitration provision was set forth in a separate, succinct paragraph, in easily readable type.  Nor was Hudson required to sign the fee agreement when it was first presented to him.  To the contrary, he was invited to ask questions and negotiate the agreement's terms.  And critically, at Hudson's request, the agreement was sent to

---

[4]    Plaintiffs have forfeited any claim that the arbitration clause is ambiguous.  (See section 3, *post*.)

Siegler, plaintiffs' long-time attorney. Defendants explicitly explained their expectation that Siegler would discuss the agreement with Hudson. In short, there are no indicia of surprise, duress, unconscionability, or any other similar grounds upon which plaintiffs can successfully challenge the arbitration clause in this case. (Cf. *Roman v. Superior Court* (2009) 172 Cal.App.4th 1462, 1470–1471 [discussing substantive unconscionability].)

In any event, to the extent defendants had a fiduciary duty to explain the terms of the agreement to Hudson, the trial court could reasonably infer from circumstantial evidence that defendants satisfied their duty by having Siegler explain the agreement to Hudson. As previously discussed, during an April 15, 2009 telephone call, Kelly, Hudson, and Siegler discussed having Kelly send Siegler a retainer agreement to review with Hudson. The following day, April 16, 2009, Kelly mailed Siegler the proposed fee agreement. The cover letter to Siegler explained, "As you know, under rules of the California Bar, attorneys are obligated to describe the basics of an attorney-client and related business relationship and in that regard, I am sending <u>directly to you</u> concurrently by email and regular mail, our proposed Engagement Agreement with the clients." After discussing matters relating to the litigation and defendants' fees, the letter emphasized, "Again, we are sending this letter and the proposed Engagement Agreement with the clients, directly and only to you for review, comments—and assume you will promptly coordinate with Herb." The enclosed fee agreement was dated April 16, 2009, and addressed to Hudson. Kelly followed up with Siegler by telephone the following day. Siegler confirmed that he had received the proposed fee agreement and said it "looks OK." Siegler told Kelly he would have Hudson sign it. By May 11, 2009, Hudson had signed the agreement and returned it to defendants. This circumstantial evidence supports the court's finding that Siegler discussed the fee agreement and the arbitration clause contained therein with Hudson before Hudson signed and returned the agreement.

At oral argument, plaintiffs' counsel emphasized that there was no direct evidence before the trial court that Siegler ever discussed the fee agreement with

Hudson. To be sure, Hudson submitted a declaration opposing arbitration because he did not recall any discussions with defendants about the arbitration clause. However, as noted by the court, Hudson failed to mention Siegler in that declaration and, in any event, the court concluded that Hudson's declaration was unpersuasive; we defer to the court's credibility assessment on appeal. (*Baker v. Osborne Development Corp.*, *supra*, 159 Cal.App.4th at p. 892.)

**3.** **Plaintiffs have forfeited any argument that the arbitration agreement did not encompass malpractice claims.**

While arbitration is "an accepted and favored method of resolving disputes" (*Powers*, *supra*, 54 Cal.App.4th at p. 1109), " 'there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate' " (*Lawrence v. Walzer & Gabrielson* (1989) 207 Cal.App.3d 1501, 1505 (*Lawrence*)). Citing *Lawrence*, plaintiffs argued below that the arbitration provision did not apply to claims of legal malpractice and therefore failed this threshold test. (*Id.* at pp. 1506–1507.) Although plaintiffs rely on *Lawrence* in their opening brief, they do not develop that argument on appeal. Their failure to do so forfeits any appellate argument that the arbitration provision was ambiguous or that it did not encompass claims of legal malpractice. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125–126.)

## DISPOSITION

The judgment is affirmed.  Defendants to recover costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

HOGUE, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.